Antoinette LOLLIS, on her own behalf and on behalf of all others similarly situated, namely those children confined to Training Schools in the State of New York, Plaintiffs,

v.

NEW YORK STATE DEPARTMENT OF SOCIAL SERVICES, George K. Wyman, Commissioner, State Department of Social Services, Frank Shaughnessy, Superintendent, Brookwood Annex to the Hudson State Training School for Girls, et al., Defendants.

Joe PENA, on his own behalf and on behalf of all others similarly situated, namely those children confined to and paroled from Training Schools in the State of New York, Plaintiffs,

v.

NEW YORK STATE DEPARTMENT OF SOCIAL SERVICES, George K. Wyman, Commissioner, State Department of Social Services, et al., Defendants.

Nos. 70 Civ. 4750, 70 Civ. 4868.

United States District Court,
S. D. New York.

Dec. 18, 1970.

Burt Neuborne, New York City, New York Civil Liberties Union, for plaintiff Lollis.

The Legal Aid Society, Brooklyn, for plaintiff Pena; James D. Silbert, of counsel.

Louis J. Lefkowitz, Atty. Gen. of State of New York, New York City, for defendants; Hillel Hoffman, New York City, of counsel.

## OPINION

LASKER, District Judge.

Plaintiffs in these companion cases are children who claim that their treatment while in custody in New York State training schools has constituted cruel and unusual punishment under the Eighth Amendment or punishment imposed in violation of the Fourteenth Amendment. They have brought separate but nearly identical class actions pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201 seeking injunctive and declaratory relief and damages. Jurisdiction is predicated on 28 U.S.C. §§ 1343 (3) and (4).

The Lollis suit is brought on behalf of all children confined to New York State training schools "who are forced to endure extended periods of solitary confinement"; the Pena action for "children confined to and paroled from such schools who have been subject to solitary confinement or subject to binding of hands and feet with handcuffs." I discuss the cases separately.

Defendants are the persons charged with the responsibility of operating the state training schools.

The plaintiffs move for preliminary injunctions to restrain defendants from imposing the treatment complained of. Plaintiff Pena also moves to consolidate the two cases.

The defendants oppose these motions and move to dismiss the complaints, and, in the event the complaints are not dismissed, to extend their time to answer.

## I.

Antoinette Lollis ("Lollis") is a fourteen-year old inmate of the Brookwood Annex to the Hudson Training School for Girls ("Brookwood Annex") in Claverack, New York. She was committed first in September 1969 as a "Person in Need of Supervision" pursuant to § 711 ff of the New York Family Court Act. She was released on June 30, 1970, but on the complaint of her mother, who was later the object of child neglect proceedings as to plaintiff's seven brothers and sisters, was returned, without hearing, to the training school in mid-August 1970.

Neither in the present case nor previously has the plaintiff been accused or convicted of a crime. Although in the present instance her mother claimed that Lollis threatened her with a knife, this Lollis denies.

Two or three days after her return to custody plaintiff became involved in a fight with a matron and another inmate. The record indicates that plaintiff was abusive and aggressive and bore the responsibility for the start of the fracas. Before peace returned it took several persons to subdue Lollis.

Immediately thereafter, without a hearing, plaintiff was confined to what is colloquially known within the training school system as a "strip room"—so called because it is stripped of all facilities normally available to inmates. Here she remained until September 4, 1970, being released at that time apparently because of the insistence of Family Court Judge Beatrice Burstein, who made an inspection of the school on September 2, 1970, and discovered Lollis confined to the strip room.

Judge Burstein's detailed report of the Lollis case, dated September 22, 1970, describes the following conditions:

"She [Lollis] was kept in a room about 6' x 9' for 24 hours a day. The first seven or eight days of confinement she was visited by a social worker. Then the social worker went on vacation and one other staff member visited her once. She was completely unoccupied for 24 hours daily. Nevertheless I inquired how she kept herself busy. She replied by saying 'I sleep all day and I cry all

night.' She had, indeed, requested to see a psychiatrist, but was informed that she would not be able to see him until she was released from solitary. She reported that she had been receiving tranquilizers for a long period of time and felt a need for them now but was unable to secure them since the psychiatrist was not available for a visit. It should be noted that Brookwood has the services of a psychiatrist one-half day every other week.

"She wore pajamas all day, sat staring at the wall and did absolutely nothing.

\* \* \* \* \* \*

"There was a wooden bench \* \* \*. There was a blanket on the bench and this was where the child rested for twenty-four hours."

Although the room contained a window, it was blinded so that it "absolutely prevented the youngster from looking outside." In each of the four wings there was a strip room for isolation purposes. The room in which plaintiff was confined was at the end of the hospital wing, completely removed from the balance of the population.

Judge Burstein questioned the Superintendent as to when Lollis might be released. He replied that, although the case was reviewed each day by the staff, he could not suggest a definite date, since release depended on Lollis' exhibiting some "movement" and on her apology to the matron (the matron was by now on vacation). When removal from the strip room occurred, he informed her, it did not mean automatic return to the community, but the child would be locked in her own room for a transition period.

Although Judge Burstein observed, "I do not suggest that commodious accommodations must be accorded to children who disturb the tranquility of the community," she nevertheless stated: "On the other hand, the cruelty of isolation and solitary confinement ought not to be augmented by surroundings so oppressive as to destroy the integrity and the identity of the child who, after all, is the object of our concern and who

must ultimately be returned to the community."

It is important to note that after her departure from the school Judge Burstein energetically attempted through administrative channels to secure relief for Lollis. Two days after her visit she called the Superintendent to ask if the plaintiff had been released or (as Judge Burstein had requested at the time of her visit) had been given any books. Release had not occurred and the request for books had been rejected. She made several attempts to reach Commissioner Wyman, but he was unavailable. A call to the Chairman of the Board of Social Welfare Services elicited the statement that members of the Board had not visited the institution (as they are required to do by §§ 6 and 18 of the New York Social Services Law, McKinney's Consol.Laws, c. 55) since they were unsalaried and there were too many institutions to visit. Finally, through efforts of the National Council on Crime and Delinquency, Judge Burstein was able to speak to the Deputy Commissioner of Social Services in Charge of Institutions, who arranged for Lollis to be released on September 4, 1970, two weeks after she had originally been isolated.

In opposition to the Lollis motion, an equally detailed, undated, report of Superintendent Frank Shaughnessy states that the strip room (described by the Superintendent as a "security room") measures 9' 4" by 7' 8", that the bed is a "bunk bed built into one of the walls, attached to the walls and the floor," 7' 8" long, 2' 7" wide and 1' 6½" high. A mattress is made available at night. It is claimed that the top pane of the window was low enough to permit visibility, and that the lower panes were painted to prevent an inmate from distracting other inmates engaged in recreation outside the room. Girls in a "security room" are kept in pajamas to prevent absconding and the hiding of dangerous objects. Lollis was issued a bathrobe, but destroyed it; for this reason it was not replaced. The use of bathroom and shower is made available. It is stated

that Lollis was visited on a number of occasions by child care workers to discuss her case and by nurses. She continued her aggressive and anti-social behavior. Her case was reviewed daily by the Adjustment Committee, and on September 4th the Committee decided that, since Lollis "indicated a willingness to resume program and to maintain herself," she should be returned to her own room in preparation for later resumption of normal activities, which occurred September 9th. The report further states that "every effort is made to return a youngster to the regular program as quickly as possible" and that girls are allowed to write their family and to receive letters while confined in a "security room."

It should be noted that the recital above is derived from unsworn reports submitted by plaintiff and the defense, and not from affidavits. Though affidavits on the part of counsel have been submitted, they are necessarily based on information and belief. While the absence of sworn evidence would create insurmountable obstacles to decision in cases involving sharp factual disputes, the key factual matters here are not in question. It is true that the tone of Superintendent Shaughnessy's report is altogether different from that of Judge Burstein, and offers a justification of the treatment of Lollis. Nevertheless, there is clear agreement that Lollis, a fourteen-year old girl who provoked a fight, was kept in isolated custody for two weeks in a room stripped of everything but a wooden bunk bed, without a mattress during the day time, with a largely blocked window, and was coincidentally released on the day on which Judge Burstein was able to secure the intervention of the Deputy Commissioner in Charge of Institutions. It is also undisputed that the Brookwood Annex is a facility intended to treat girls with particularly difficult behavioral problems, and for the purposes of this motion I accept the Superintendent's claim that Lollis is such a girl. This area of agreed fact is sufficient to permit a disposition of the case.

## II.

In this context the plaintiff contends that the practice in the New York State training schools of isolating children for extended periods of time (1) violates the Eighth Amendment because it constitutes cruel and unusual punishment, (2) is unlawful because it imposes punishment on persons civilly committed who are not convicted of a crime, and (3) violates the due process clause of the Fourteenth Amendment because the isolation is imposed in the absence of procedural safeguards.

Defendants argue that the case should be dismissed because (1) it fails to state a claim upon which relief can be granted, (2) it fails to present facts calling for the exercise of federal jurisdiction, and, in addition, (3) there are no grounds for the granting of an injunction or the allowance of damages.

Before reaching the merits of plaintiff's claims I discuss the issues raised by defendants.

Defendants assert that the complaint does not state a claim under the Civil Rights Act and ask that "at the threshold" the court take judicial notice of the regulations of the State Board of Social Welfare, filed July 27, 1970, which prohibit the abuse of children and the use of solitary confinement. Recognizing that, although the regulations bar the use of solitary confinement, they do permit "isolation" (without defining the term or distinguishing it from "solitary"), defendants argue that isolation is necessary on occasion for a child's safety or the safety of the other children and the staff. It is not to be doubted that under proper circumstances custodial authorities may isolate an inmate for such reasons. As stated in Davis v. Lindsay et al., 321 F.Supp. 1134 (S.D. N.Y.1970):

"Without doubt prison officials are authorized to isolate persons in their

custody when substantial evidence establishes a threat to the safety of the prisoner, other inmates, or institution personnel, * * *."

Indeed plaintiff does not contend that isolation of inmates is unconstitutional per se, but rather that extended isolation, or isolation imposed on civil inmates as punishment, or isolation imposed without procedural safeguards, violates the Constitution. The plaintiff does not attack the regulations as far as they go, but, on the other side of the coin, the regulations do not save the day for the defendants since what the plaintiff attacks are the practices which the regulations have failed to control. At this stage of the proceedings the validity of these practices must be measured by the evidence contained in the affidavits of experts yet unmentioned in this opinion, but discussed in detail below. It is sufficient to state at this point that such evidence negates the contention that a civil rights claim has not been stated.

Nor are the decisions in United States ex rel. Hyde v. McGinnis, 429 F.2d 864 (2d Cir.) June 19, 1970, and Church v. Hegstrom, 416 F.2d 449 (2d Cir. 1969), on which defendants rely, to the contrary. *Hyde* held that where the complaint alleges "not that he has been completely denied needed medical care by a wilful refusal of the prison authorities to assist him," but rather, facts amounting only to "faulty judgment on the part of the prison doctor in choosing to administer one form of the same medication instead of another" the allegations did not state a § 1983 claim. In *Church,* the court found that the complaint merely alleged negligence as to the plaintiff's medical needs, and that such allegations were not sufficient to state a § 1983 claim against the prison doctor, and

"Even in regard to the three defendants who might have had some direct responsibility for prisoner supervision, nothing was alleged to show specific, exceptional circumstances

outside the normal processes of prison administration." (at 451).

But here the complaint shows quite specific circumstances, and the very protestations of the defendants that isolation is rarely invoked in state training schools, and even more rarely for as long a period as occurred in the plaintiff's case, render those circumstances "exceptional." Indeed, the very practice here—extended solitary confinement—has been held by the Court of Appeals of this Circuit, this court, and the United States District Court for the Northern District of New York to state a § 1983 claim. Wright v. McMann, 387 F.2d 519 (2d Cir. 1967); Sostre v. Rockefeller, 312 F.Supp. 863 (S.D.N.Y.1970); Wright v. McMann, 321 F.Supp. 127 (N.D.N.Y. 1970); and United States ex rel. Mosher v. LaVallee, 321 F.Supp. 127 (N.D.N.Y. 1970).

In commenting on Judge Kaufman's statement in *Hyde* that "barbarous" acts or a wilful refusal to accord treatment are required to state a § 1983 claim, defendants assert (Memorandum, p. 8):

"Plaintiff presents no evidence that children are subjected to beatings or starvation or any forms of physical barbarity, other than that she was confined to a 'strip room' without furnishings."

But it is not necessary to present evidence of beatings or starvation to state a § 1983 claim. It is sufficient, for example, to show, as here, that plaintiff was held for two weeks in isolation which, according to a Family Court Judge of New York inspecting the situation, was "augmented by surroundings so oppressive as to destroy the integrity and the identity of the child. * * *" Quite obviously, the conditions in which plaintiff was held shocked the conscience of that judge.

Nor is there merit, in these circumstances, to the defendants' argument that "in the event that any child is subjected to barbarous treatment in

clear violation of state rules, there is no reason why these violations cannot be brought to the attention of appropriate state authorities rather than become the subject of a federal civil rights action." Of course, the federal courts should not interfere with the administration of state institutions except under extraordinary circumstances (Wright v. McMann, 387 F.2d 519), and federal judges do not happily do so. But here the futility of invoking the state procedure could not have been more clearly evidenced. The real difficulties of securing administrative relief were exquisitely illustrated by the nearly frustrated efforts of a Family Court Judge in plaintiff's behalf. Indeed, plaintiff was fortunate that Judge Burstein fortuitously discovered her condition. If this had not been the case, plaintiff, without counsel and probably without means to hire counsel, would have had to rely either on the Superintendent's monthly report to the Commissioner detailing isolations or the monthly visits (if made) by the State Board of Social Welfare. Either such reports and visits are made or they are not. If they are, they were of no value to plaintiff; if they are not, the remedy is even less efficient. In either event, to require plaintiff, in the circumstances of this case, further to exhaust her administrative remedies would constitute the "wooden application of the exhaustion doctrine in·cases under the Civil Rights Act" which Eisen v. Eastman, 421 F.2d 560, 569 (2d Cir. 1969), finds Supreme Court decisions "condemn."

Coleman v. Ginsberg, 428 F.2d 767 (2d Cir. 1970), cited by defendants, is not to the contrary. There the court held only that the District Court had not abused its discretion in dismissing a civil rights action where the record was doubtful that constitutional rights were involved rather than an interpretation of state law. Even under such circumstances, the Court of Appeals pointed out that, according to Supreme Court decisions, "the better practice" would be for the federal court to retain jurisdiction and stay its proceedings pending determination by the state courts. *Id.* at 770.

 The defendants contend also that, even if plaintiff has exhausted her state administrative remedies, the matter should be left to the state courts. But, as stated in Wright v. McMann, *supra,* 387 F.2d at 524:

> " * * * the latest pronouncement on the subject by the Supreme Court emphasizes that the doctrine [abstention] is to be applied 'only in narrowly limited "special circumstances."' Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391 [19 L.Ed.2d 444,] * * *."

And further, (at 525):

> " [i]t is reasonable to conclude that cases involving vital questions of civil rights are the least likely candidates for abstention, e. g., McNeese v. Board of Education, supra, 373 U.S. [668] at 673–674, 83 S.Ct. 1433 [10 L.Ed.2d 622] * * *."

Defendants' final points are that there are no grounds for issuance of an injunction nor for the granting of damages. The propriety of injunctive relief is discussed below in relation to the merits of the case. As to the question of damages, suffice it to say that it is not raised, of course, by plaintiff's motion. Insofar as it may be relevant to defendants' motion to dismiss—since defendants contend that plaintiff's damages, if any, clearly do not exceed $10,000—it need only be observed that jurisdiction here is not predicated on 28 U.S.C. § 1331 (federal question) but on 28 U.S.C. § 1343(3) (deprivation of constitutional rights under color of state law).

### III.

I come now to the merits of the Lollis case.

 The Eighth Amendment's prohibition of cruel and unusual punishment is binding on the states through the Fourteenth Amendment. Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962); Francis v. Res-

weber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947).

The concept of cruel and unusual punishment has, of course, varied through the course of history, and, as the court observed in Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed. 2d 630 (1958):

> "The [Eighth] Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."

 Two tests have been applied to determine whether the Amendment applies: first, whether the punishment is disproportionate to the offense, Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1909); second, the severity or harshness of the sanction as measured by "broad and idealistic concepts of dignity, civilized standards, humanity, and decency * * *" Jackson v. Bishop, 404 F.2d 571, 579 (8th Cir. 1968), Opinion of Judge (now Mr. Justice) Blackmun.

In support of Lollis' motion there have been submitted the affidavits of seven psychiatrists, psychologists, and educators of delinquent juveniles. They are unanimous in their condemnation of extended isolation as imposed on children, finding it not only cruel and inhuman, but counterproductive to the development of the child. This group is made up of men and women of high standing and expertise.[1] Most surprisingly, although the key to decision of the Eighth Amendment issue lies in a determination as to whether Lollis' two-week isolation in a stripped room was disproportionate or inherently harsh, no affidavit on the subject has been submitted by the defendants. Indeed, the only contest, if it may be termed a contest, which defendants have made of the affidavits of experts

---

1. Affiants and their qualifications:

Robert E. Gould, M.D., Associate Professor of Psychiatry, New York University School of Medicine, and Director of Adolescent Services, Bellevue Psychiatric Hospital.

Dr. Ernst Papenek, a former Professor of Education at City University of New York, former director of children's homes and experimental schools of Organisation de Sante et de l'Education in France, has served as Director of Child and Youth Project Department of the Unitarian Service Committee and as Executive Director of the Brooklyn Training School for Girls and of the Wiltwyck School for Boys, presently a member of the Board of Education of Wiltwyck School.

Joseph D. Noshpitz, M.D., Associate Professor of Psychiatry, Howard University, Washington, Assistant Professor of Psychiatry at University of Maryland, Past President of American Association for Children's Residential Centers, Secretary of American Academy of Child Psychiatry, Chairman of Group for Advancement of Psychiatry Committee on Adolescence, Member of Board of Directors of Joint Commission on the Mental Health of Children, Director of Clinical Institute of Hillcrest Children's Center, Psychiatrist in Chief of Children's Hospital of the District of Columbia.

Dr. Esther Rothman, licensed psychologist and currently Principal of Livingston School for Girls, a special school for socially maladjusted and emotionally disturbed children.

E. Richard Feinberg, M.D., a physician licensed to practice medicine in the State of New York, certified by the American Board of Psychiatry and Neurology as a specialist in the areas of adult and child psychiatry, Assistant Professor of Psychiatry in Albert Einstein College of Medicine, a Fellow of American Academy of Child Psychiatry, and a member of the Task Force on Child Psychiatry of the American Psychiatric Association, currently director of the Bronx Children's Psychiatric Hospital.

Professor Jack Oshwetz, a certified social worker and psychoanalyst, currently Professor in Graduate School of Social Services at Fordham University and Supervisor of the Post-Graduate Center for Mental Health in New York City.

Peter Blos, Ph.D., a certified clinical psychologist, President of American Association for Child Psychoanalysis, Inc., Fellow of American Orthopsychiatric Association, Diplomate in Clinical Psychology, American Board of Examiners in Professional Psychology, Honorary Member of American Society for Adolescent Psychiatry, recipient of Distinguished Service Award of American Society for Adolescent Psychiatry, a Special Member of the New York Psychoanalytic Society, and Faculty Member of New York Psychoanalytic Institute.

supporting plaintiff's motion is to offer an unsworn statement of Superintendent Shaughnessy entitled, "Isolation Policies," which refers (1) to the writings of Dr. William Glasser, whose qualifications are not set forth; (2) to certain experimental work of "Tyler and Brown" and "Burchard and Tyler," not identified in any way, however well known they may or may not be to the cognoscenti; and (3) to the views of Dr. Lewis Jarett, a consultant at Brookwood Annex, who is Director of Columbia County Mental Health Clinic (N.Y.), that the use of security rooms can be a "helpful experience." Even if Superintendent Shaughnessy's statement with its second-hand references to the views of others were to be accorded the quality of an affidavit, it is clearly outweighed by the affidavits in support of plaintiff's motion, not because of their number (though that is impressive), but because of the standing of the affiants, the wealth and diversity of their expertise, and the unconditional nature of their opinions.

The following statements are excerpts from affidavits in support of Lollis' motion, prepared with relation to the facts of this case:

*Robert E. Gould, M.D.*—Affidavit sworn to November 5, 1970:

"In my opinion it is unconscionably cruel and inhumane treatment to put an adolescent in isolation for a two-week period. In fact one day of such isolation would not constitute constructive action to rehabilitate a troubled youngster. To deprive a human being of books or any other material with which one can become involved and to prohibit interpersonal communications can only insure increasing the pathology that a youngster displays.

"Isolation as a 'treatment' is punitive, destructive, defeats the purposes of any kind of rehabilitation efforts and harkens back to medieval times. There is no justification for such treatment unless one wants to dehumanize a young person in trouble and wants to create more trouble with such a person in the future.

"I decry the isolation method totally as a method to be used in reconstructing young people's personalities. It only destroys what good parts of the personality one could work with and build on."

*Dr. Ernst Papanek*—Affidavit sworn to November 6, 1970:

"I do not believe that prolonged isolation of any child can have either educational or treatment value for the child concerned. On the contrary, I believe that such isolation is psychologically destructive and educationally self-defeating.

"Isolation is one of the most devastating actions which society can visit upon any of its members. Whether it is done with the intention to help or to punish is irrelevant. Neither retributive nor so-called 'deterrent' punishment, even when sometimes emotionally understandable, is ethically or psychologically constructive with children."

*Joseph D. Noshpitz, M.D.*—Affidavit sworn to Nov. 6, 1970:

"This is to certify that in my opinion extended isolation of a youngster exposes him to conditions equivalent to 'sensory deprivation'. This is a state of affairs which will cause a normal adult to begin experiencing psychotic-like symptoms, and will push a troubled person in the direction of serious emotional illness.

"What is true in this case for adults is of even greater concern with children and adolescents. Youngsters are in general more vulnerable to emotional pressures than mature adults; isolation is a condition of extraordinarily severe psychic stress; the resultant impact on the mental health of the individual exposed to such stress will always be serious, and can occasionally be disastrous."

*Dr. Esther Rothman*—Affidavit sworn to Nov. 6, 1970:

"There is no professional justification whatever for the confinement of a child under the conditions described in the report of Judge Burstein. Such confinement cannot be classified as anything other than punitive."

*E. Richard Feinberg, M.D.*—Affidavit sworn to Nov. 9, 1970:

"In summary, I am wholly against the concept of punitive and/or prolonged isolation of children, normal or aberrant in their behavioral development. While brief isolation may be clinically indicated in both groups of youngsters, punitive, prolonged isolation never can promote emotional development in the direction of health; more often it may be the vehicle whereby sadistic impulses in the adults caring for children may be discharged, to the great detriment of the mental health of the latter."

Concern as to isolated or solitary confinement of children in New York State training schools is not of sudden origin. As a result of the primary urging of the Citizens' Committee for Children of New York, Inc., an established private welfare organization which had studied the state training schools in depth (see "The New York State Training School System: Findings and Recommendations from Citizens' Committee for Children of New York, Inc., December 15, 1969, exhibit to Pena's memorandum on this motion), the New York State Legislature at its 1970 session passed Assembly Bill 4658 intended to regulate the imposition of such confinement. The bill, which would have barred solitary confinement for children under 13 (except for medical reasons, and then only when authorized by medical personnel) and allowed such confinement for older children by administrative personnel only up to 24 hours, and thereafter upon written certification of the State Commissioner of Social Services only up to 48 hours, was vetoed by the Governor on grounds urged by the highly respected Community Service Society (of New York City) that the regulation of such isolation should be administrative rather than legislative to allow some element of flexibility. In his veto message the Governor expressed his concern as to the isolated confinement of children and "urged" the New York State Department of Social Services to enact regulations to control such confinement, which, as noted earlier, the State Board of Social Welfare did in fact do during July 1970.[2]

■ Measured by the standards of the Eighth Amendment cases cited above, the views of experts in the field of adolescent psychology just quoted, and the legislative consensus expressed by the passage of Assembly Bill 4658, a two-week confinement of a fourteen-year old girl in a stripped room in night clothes with no recreational facilities or even reading matter must be held to violate the Constitution's ban on cruel and unusual punishment. See, also, Sostre v. Rockefeller, *supra* (S.D.N.Y.1970); Wright v. McMann, *supra,* and United States ex rel. Mosher v. LaVallee, *supra* (both N.D.N.Y.1970).

In so holding, I do not mean to intimate that the isolation of children under any circumstances is unconstitution-

2. The regulations enacted specifically prohibit solitary confinement, but explicitly provide that "[a] child may, however, be isolated in the interest of his own safety or that of the other children and staff." Although one of the criticisms referred to in the Governor's veto message on Assembly Bill 4658 was that "the terms 'solitary confinement' and 'isolation' are nowise defined in the bill," they are, surprisingly, not defined in any way in the regulations either. Although the regulations require a daily review by the head of the institution or his designee of the necessity for isolation and specify that "every effort shall be made to return the child to the regular program of care as quickly as possible," they provide no maximum period of isolation and require no hearing as to its original necessity, and they are silent as to the conditions under which children may be kept in "isolation."

al, but merely that the treatment of Lollis in this case violated permissible bounds. I share the hesitancy of fellow judges in interfering with the administration of custodial institutions, and sympathize with the difficult problems which disciplinary matters present to administrative officials, especially when they may be "second guessed" by the courts. But the teaching of Wright v. McMann, *supra*, 387 F.2d 519, is that where a constitutional violation occurs the courts may not ignore it in favor of the integrity of administrative authority.

The determination that the Eighth Amendment has here been violated renders it unnecessary to determine whether the treatment of Lollis may also be vulnerable under other provisions of the Constitution.

*Preliminary Injunction:* The classic criteria for the determination of whether a preliminary injunction should be granted are the probability of plaintiff's success on the merits, the irreparability of harm to plaintiff pendente lite, balancing of the hardships which an injunction or its absence would impose on the parties, and, finally, the public interest. Measured by these standards, I find that a preliminary injunction, in the limited terms set forth below, should be granted. Plaintiff has established a probability of success on the merits as to the constitutional question. (I intimate no views as to damages, as to which no proof has been offered on this motion.) Imminence of harm or, put another way, irreparability of damage to the plaintiff is demonstrated by Lollis' continuance in custody and the views, articulated on this motion by Superintendent Shaughnessy (the sole defendant to submit any statement, much less affidavit) that treatment of Lollis was correct. cf. Fhagen v. Miller, 306 F.Supp. 634, 636–637 (S.D.N.Y. 1969), (Weinfeld, J.). The balance of hardships favor plaintiff, and the public interest surely requires the prevention of Eighth Amendment infractions.

Accordingly defendant Shaughnessy and anyone subject to his direction will be enjoined, pending trial, from placing plaintiff in isolation for an extended period or without the enjoyment of reasonable facilities during any such isolation. For the purpose of implementing the injunction there shall be included in the decree standards for the imposition of any isolation and a description of the minimum facilities to be afforded plaintiff in the event of such isolation. Defendant Shaughnessy shall, within 10 days of the filing of this opinion, submit to the court and to plaintiff's counsel proposed standards, which shall include: (1) maximum period of confinement, (2) place of confinement, (3) facilities to be afforded the child within the place of confinement, including (a) normal furnishings, bed and chair, (b) reading material, (c) other recreation such as exercise and air, (4) extent to which child may be permitted to join in common activities even during period of isolation, (5) visitation by staff members, (6) maximum, if any, number of times of confinement within a larger period such as one year, (7) reports by the Warden to the State Board as to confinement, and (8) such other suggestions as the parties may wish to make.

Plaintiff shall submit any counterproposals within five days after service of Superintendent Shaughnessy's material.

Plaintiff's request for a preliminary injunction to restrain "defendants from imposing prolonged solitary confinement upon any child confined to a New York Training School" is denied, without prejudice, except to the extent granted above. There is no showing that the action of other defendants is such as to warrant interference by the court, or that other children are in jeopardy.[3] Indeed, the record establishes that isola-

3. It is also to be noted that, although the case has been brought as a class action, no application has been made that it be determined as such and it is doubtful whether class relief will be appropriate until such determination has been made.

tion is never invoked at five of the twelve training schools, and rarely at two others. While this box score may not be entirely satisfactory, it does demonstrate the inappropriateness of a statewide injunction, and this court should be guided by a standard of minimum rather than maximum interference. Furthermore, the defendants have indicated (Defendants' Memorandum in Pena case, p. 12) that an injunction on behalf of one plaintiff would be "respected by the State of New York to the same degree as an injunction on behalf of unnamed and unspecified plaintiffs," and the court assumes that this representation would apply also where the injunction is restricted to one defendant. Finally, since the denial of a wider injunction is without prejudice, plaintiffs are free to present other claims if they arise.

## FACTS AS TO PENA

■ Joe Pena is a sixteen-year old boy who was confined at the Goshen Annex of the New York State Training School for 11 months until October 31, 1970 (a week before the filing of his suit), when he was paroled until July 27, 1971. He remains under the supervision of the School, to which he may be returned without a hearing if he violates parole. He was originally adjudicated a juvenile delinquent in November 1964. In February 1970, he was involved in a fight with a guard and after being subdued by several guards he was confined, without hearing, to a strip room at Goshen. Handcuffs were placed on his hands and feet and they were bound together as he lay face down on the floor. Plaintiff claims that the binding and handcuffing lasted two to three hours. Defendants estimate the time at only forty minutes. Pena was kept isolated from February 1 through February 6, when he was released. With minor variations which do not affect the disposition of the case here, the circumstances in which he was held in isolation were the same as those in which Lollis was held.

A supplemental affidavit, sworn to December 4, 1970 by Connee Grotsky, an attorney with the Family Court Branch of the Legal Aid Society, uncontested by the defendants, establishes that as of December 1, 1970, seven boys were being held in isolation in strip rooms at Goshen, and two had been so confined for more than one week.

## RELIEF AS TO PENA

On the basis of these facts, and the considerations expressed above as to the Lollis case, a preliminary injunction will also be granted restraining Superintendent Catalett of the Goshen Annex from imposing extended isolation on Pena should plaintiff Pena be returned to his custody (Fhagen v. Miller, *supra*) except under the conditions to be specified in the decree. Superintendent Catalett and the plaintiff shall submit proposed conditions in the manner specified above as to the Lollis case.

■ No preliminary injunction will be granted to restrain handcuffing or binding of feet, since there is too sharp a dispute of facts to establish that the period for which Pena was handcuffed and bound was cruel and inhuman. It may be said that a minimal period of handcuffing or binding, where the reasonable necessity for such action is demonstrated, would not violate constitutional rights while, at the other end of the spectrum, unnecessary or prolonged handcuffing or binding might well do so.

■ *Motion to Consolidate:* The defendants agree that consolidation of the two cases is appropriate for discovery purposes other than as to damage. There is no basis for consolidation as to damages, either for discovery or trial, and the cases ought not be consolidated for trial since the issue of handcuffing does not arise in Lollis, and to consolidate the trials might unfairly prejudice the defendants in that case.

For the reasons stated above the motions for temporary injunctions are

granted to the extent and upon the conditions stated. The motions to dismiss are denied. The motions to extend the defendants' time to answer is granted.

The parties shall submit proposed orders to include the material specified in the body of this opinion.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, this opinion constitutes the court's findings of fact and conclusions of law.