Eric NELSON, by his next friend, Corine Nelson, et al., Plaintiffs,

v.

Robert P. HEYNE, Individually and in his capacity as Commissioner of Corrections, Indiana Department of Corrections, et al., Defendants.

Civ. A. No. 72 S 98.

United States District Court,
N. D. Indiana,
South Bend Division.

June 15, 1972.

Supplemental Opinion Feb. 8, 1973.

Thomas DiGrazia, Youth Advocacy Program, John P. Forhan, Legal Services—Legal Education Program, South Bend, Ind., for plaintiffs.

T. E. Lauer, Director, Ralph Faust, Jr., St. Louis, Mo., Thomas L. Shaffer, Dean, University of Notre Dame Law School, Thomas F. Broden, Jr., Director, Institute of Urban Studies, University of Notre Dame, Notre Dame, Ind., for plaintiffs, on behalf of the National Juvenile Law Center, amicus curiae.

Dale E. McCoy, Asst. Atty. Gen., Indianapolis, Ind., for defendants.

## MEMORANDUM AND ORDER

GRANT, Senior District Judge.

On May 12, 1972, Plaintiffs filed a class action seeking declaratory and injunctive relief with respect to the Defendants' operation of the Indiana Boys School.

The Indiana Boys School is a medium security state correctional institution for boys 12 to 18 years of age, an estimated one-third of whom are non-criminal offenders. Although its optimum capacity is something less than 300, the School's population is generally maintained at close to 400 inmates. The counseling staff consists of 20 individuals including three psychologists holding under-graduate academic degrees, and one part-time

psychiatrist who spends four hours a week at the institution; the medical staff includes one part-time physician, one registered nurse, and one licensed practical nurse.

Plaintiffs claim that the general operation of the Indiana Boys School violates certain Indiana statutes governing the treatment of juveniles in Defendants' custody as well as Plaintiffs' right to rehabilitative treatment guaranteed by the Constitution, an issue which shall be the subject of further orders by this Court pending supplementation of the record. Additionally, plaintiffs point to certain institutional practices and policies of the Defendants, said to offend rights secured by the 1st, 5th, 8th, and 14th Amendments to the Constitution. These practices and policies involve the Defendants' use of corporal punishment, control-tranquilizing drugs, solitary confinement, mail censorship, and religious services. Following the conclusion of a three-day evidentiary hearing and oral arguments, the Court made certain findings as to these practices and indicated said directives would become incorporated into a written opinion.

■■ At the outset, defendants raise certain challenges to the Court's jurisdiction, the first being that the 11th Amendment bars the instant action. It is the Court's view that the Amendment does not preclude jurisdiction. Clearly the 8th and 14th Amendments are applicable to state-managed services. Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). Plaintiffs' complaint states a cause of action against the Defendants individually and in their respective official capacities for acts claimed to have been taken under color of state law in violation of rights secured by the Constitution. 42 U.S.C. § 1983; 28 U.S.C. §§ 2201, 2202; Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). The Court further finds that the Plaintiffs' cause satisfies F.R.Civ.P. 23 and may be maintained as a class action. Holt v. Sarver, 309 F.Supp. 362 (D.C.Ark.1970).

### Corporal Punishment

■ The evidence indicates that inmates incur supervised beatings by use of a thick board for violating institutional rules. Although defendant Bennett stated that corporal punishment is a "last resort", there is a failure of proof as to any formalized procedures governing its administration. The evidence suggests that the punishment could be employed with the concurrence of two or more members of the staff. The only control indicated is that two adult staff members must be present to observe the beatings. Customarily the practice is used against any and all inmates who are returned from an escape. Defendants revealed that the policy of corporal punishment has fluctuated greatly over the last few years (during some periods being totally discontinued) and that current plans call for phasing out the punishment during the next few months.

Expert opinion adduced at the trial was unanimous in condemning the practice of corporal punishment. The uncontradicted evidence of the authorities suggests that the practice does not serve either as useful punishment or as treatment. Testimony adduced at the trial shows that it actually breeds counter-hostility resulting in greater aggression by a child. Among the other child-correctional institutions discussed during the hearing, none continues the practice of corporal punishment.

One court holding that the use of corporal punishment as applied to adult offenders violated 8th Amendment standards observed, ". . . irrespective of any precautionary conditions which may be imposed [use of a strap], offends contemporary concepts of decency and human dignity and precepts of civilization which we profess to possess . . . ." Jackson v. Bishop, 404 F.2d 571, 579 (8th Cir. 1968).

The Court fails to see any distinction between use of a strap and use of a thick board and concurs in the result reached by the 8th Circuit. Accordingly, the Court finds the Defendants'

present practice with respect to corporal punishment to be in violation of the Plaintiffs' 8th Amendment rights and orders an immediate cessation of the practice.

## Use of Tranquilizing Drugs

Major tranquilizing drugs are occasionally administered by the Defendants for the purpose of controlling excited behavior rather than as part of an ongoing, psycho-therapeutic program. Standing orders by the doctor at the Boys School permits the registered nurse and licensed practical nurse on duty to prescribe dosages of specified tranquilizers upon the recommendation of the custodial staff at the Boys School. The drugs are administered inter-muscularly. The facts show that there is no procedure utilized whereby medically competent staff members evaluate individuals to whom the drugs are administered, either before or after injections.

The evidence demonstrates that the type of drugs used by Defendants have potentially serious medical side effects, that they are normally employed to control psychotic and prepsychotic behavior during a course of treatment, and that they require close supervision of the patient by professionally trained individuals. Further, it is more common medical practice to offer a patient an oral administration of the drug before introducing it inter-muscularly.

Peek v. Ciccone, 288 F.Supp. 329 (W.D. Mo.1968), cited by the Defendants, which held inter-muscular injections of Thorazine to not be cruel and unusual punishment clearly is inapposite. In *Peek* the Plaintiff first refused the medication orally; he was examined by a psychiatrist prior to taking the drug; the drug was specifically prescribed by a physician; follow-up medical treatment was employed, and the injection was administered at a medical center.

■ The Court finds as shocking to the conscience and violative of the Plaintiffs' 8th and 14th Amendment rights the Defendants' present policy with re-

spect to tranquilizing drugs. Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); Lollis v. New York State Department of Social Services, 322 F.Supp. 473 (S.D.N.Y.1970); Hancock v. Avery, 301 F.Supp. 786 (M.D. Tenn.1969).

While the Court believes that these drugs may be used occasionally to calm states of excitation which are found to be potentially dangerous to life and property, the Defendants' policies are far afield of minimal medical and constitutional standards. Accordingly the Court orders the immediate cessation of tranquilizing drugs which are administered without the specific authorization of a physician. In addition, no drug may be administered inter-muscularly without first attempting oral medication, unless ordered otherwise by a physician in each case. It is further ordered that defendants prepare and submit for the Court's evaluation a formalized policy governing use of tranquilizing drugs. The proposal must include detailed provisions governing the prescription of drugs, the administration of drugs, and procedures to insure psychological and medical evaluation of those to whom drugs are given.

## Solitary Confinement

Denominated "cottage detention" by the Defendants, the policy of solitary confinement takes place on several levels, the practice in issue being known as "Status I" confinement. Pursuant to regulations promulgated in January, 1972, a boy may be placed in solitary confinement for periods of time ranging from five to thirty days for violations of certain institutional rules.

Plaintiff Roberts spent over one-hundred-and-fifty days in this confinement during several periods of commitment at the Boys School between August, 1970 and late January, 1972. One period of solitary confinement included fifty-seven consecutive days during which he mutilated himself on three occasions and was immediately returned to confine-

ment following medical attention, without receiving recommended psychiatric treatment. Consistent with Defendants' policies, other plaintiffs reported spending from several days to four weeks at a time in the solitary cells.

During the periods of confinement, Plaintiffs are kept in a locked room approximately 9′ x 12′ in size. Toilet facilities, a bed, and a Bible are furnished in each cell. Hot meals are taken in the room which is constantly locked except for periods of time during which inmates may have the door opened while they are shackled to their bed. Showers are provided every several days together with a change of clothing.

The evidence suggests that the boys incarcerated in solitary confinement receive very sporadic contact with the treatment staff. Vocational and academic education as well as recreational activities are suspended during the detention. Staff counselors and members of the psychology department communicate with the detainees as frequently as once a day and as infrequently as once a week for intervals of time generally less than twenty minutes on each occasion.

The institution does not have a formal procedure leading to commitment in solitary confinement. Upon the recommendation of any staff member, a boy may be sent immediately to detention. The practice normally involves an informal meeting of the boy and his immediate supervisory staff some time after detention has begun, during which the boy is permitted to speak; the ultimate determination to continue detention often involves the complaining member of the staff.

■ Expert testimony offered during the course of the hearing revealed that prolonged and total isolation such as that practiced at the Boys School is emotionally and psychologically debilitating and serves neither treatment nor punitive goals. Although exclusion may be required in an institutional setting, it must be closely regulated. At a minimum this initially requires that the choice to commit one to solitary be an informed decision; the child must be aware of the reason for his detention, and the committing authority must demonstrate that isolation for a given period of time in each child's case meets the best treatment interests of the child. Secondly, the decision must be subject to regular, periodic review by professionally competent treatment personnel familiar with the effect continuing isolation has on the detainee. Lastly, the detained child must be given reasonable access to his peers and treatment staff, a reasonable amount of reading and/or recreational material, and opportunities for daily physical exercise throughout the duration of detainment.

■ The Court finds the practices now employed by Defendants with respect to cottage detention both cruel and unusual punishment and totally devoid of the most rudimentary notions of procedural due process. Lollis, supra; Smoake v. Fritz, 320 F.Supp. 609 (S.D. N.Y.1970); Bundy v. Cannon, 328 F. Supp. 165 (D.C.Md.1971); Sostre v. Rockefeller, 312 F.Supp. 863 (S.D.N.Y. 1970).

■ The use of solitary confinement does not of itself constitute cruel and unusual punishment. Ford v. Board of Managers of New Jersey State Prisons, 407 F.2d 937 (3rd Cir. 1969). The quality of confinement, however, is subject to limitations imposed by the 8th Amendment. The court in Lollis, supra, held that, "Measured by the standards of the Eighth Amendment . . . [and] the views of experts in the field . . ., a two-week confinement of a fourteen-year-old girl in a stripped room in night clothes with no recreational facilities or even reading matter must be held to violate the Constitution's ban on cruel and unusual punishment." 322 F.Supp. at 482. In Pena v. New York State Department of Social Services, 322 F.Supp. 473 (S.D.N.Y.1970), a companion case to Lollis, the court held that the use of shackles on a male juvenile detained in isolation for periods of time ranging

from forty minutes to two hours was impermissible, finding: "It may be said that a minimal period of handcuffing or binding, where the reasonable necessity for such action is demonstrated, would not violate constitutional rights while, at the other end of the spectrum, unnecessary or prolonged handcuffing or binding might well do so." 322 F.Supp. at 484.

Sostre v. McGinnis, 442 F.2d 178 (2nd Cir. 1971) reversed the lower court's finding in Sostre v. Rockefeller, *supra*, noting that the Plaintiff in confinement had been furnished opportunities for exercise, group therapy, general reading matter, and communication with other segregated prisoners. The evidence in the case at bar is clearly distinguishable. Furthermore, there is a legal distinction in the nature of treatment appropriate to a convicted felon and that accorded one adjudged a juvenile delinquent. *Lollis, supra,* at 1119.

■ Preliminary to confinement in solitary detention, an inmate is entitled to elementary procedural due process. Although the procedures leading to commitment need not be equivalent to those accorded one in the judicial process, they must conform to basic standards of fairness. *Bundy, supra*; *Smoake, supra.* At a minimum, this requires that all inmates be made aware of the possible institutional rules and sanctions as well as the administrative procedures governing the commitment. There must also be an expeditious hearing. Prior to the hearing, an inmate must be adequately informed of the charges against him. During the hearing, he must be given an opportunity to confront his accusers and present any evidence in his own behalf. Those sitting as triers of fact must be persons other than the complainant. A written record of disposition must be made in a form sufficient to permit an administrative review of the decision.

Defendants are ordered to immediately implement a policy of detention in accordance with the Court's discussion of minimal standards. Further, within 30 days hereafter, the Defendants are ordered to prepare and submit for the Court's evaluation a report detailing the measures to be applied to inmates subject to detention in solitary confinement.

## Mail Censorship

Plaintiffs testified that both incoming and outgoing mail is opened and reviewed by the Defendants. The Defendants explained that each inmate prepares a "correspondence list" upon admission to the School. Boys School policy permits correspondence with an inmate's immediate family and close friends. Other than mail addressed to or from governmental agencies or legal counsel, all letters are subject to being opened. In Defendants' experience, various types of contraband matter has been discovered in incoming packages and letters addressed to inmates.

■ Judge James E. Doyle of the Western District of Wisconsin recently concluded that, ". . . freedom to use the mails is a First Amendment freedom. Odell v. State of Wisconsin Department of Health and Social Serv., 319 F.Supp. 305 (W.D.Wis.1970) . . . . I conclude that in the general population, each individual's interest in correspondence by mail with another is fairly to be characterized as a 'fundamental' interest. I conclude that when the government undertakes to deny this freedom to a member of the class of persons who have been convicted of crime, while granting it to members of a class of persons who have not been convicted of crime, the burden is upon the Defendant to show a compelling governmental interest in this differential in treatment." Morales v. Schmidt, 340 F.Supp. 544, 554 (W.D.Wis.1972). We adopt Judge Doyle's view of the law.

■ Defendants have failed to present any rationale for imposing a "correspondence list", or limiting persons with whom Plaintiffs may correspond, or opening outgoing mail. Accordingly, absent any future showing of "compelling governmental interest", the

Defendants are permanently enjoined from the continuation of these practices. With respect to incoming mail, Defendants may only open those types of mail receptacles reasonably likely to be designed to carry contraband.

### Freedom of Religion

Defendants' policy requires compulsory attendance of Protestant or Catholic services held each Sunday at the institution. An attempt is made to keep the services non-denominational in character.

■ Plaintiffs' evidence is not to the contrary of the policy presented by Defendants; two of the inmates indicated a preference for beliefs other than Protestant or Catholic. However, neither suggested that Defendants failed to accord them an opportunity to either believe or practice a form of religious activities.

Accordingly, the Court finds that Plaintiffs have failed to support a claim of religious discrimination. Cf. Barnett v. Rodgers, 133 U.S.App.D.C. 296, 410 F.2d 995 (D.C.Cir. 1969); Tilden v. Pate, 390 F.2d 614 (7th Cir. 1968).

The foregoing shall constitute the findings of fact and conclusions of law required by F.R.C.P. 52, and judgment for the Plaintiff shall be entered in accordance with the Court's findings. Defendant is ordered to prepare and submit for the Court's evaluation those matters requested in the above memorandum opinion within thirty days of date of entry below.

### SUPPLEMENTAL OPINION

On May 12, 1972, plaintiffs filed this class action seeking declaratory and injunctive relief with respect to the defendants' operation of the Indiana Boys School. Plaintiffs' challenges to certain of the Institution's practices and policies have been considered in this Court's earlier Memorandum and Order entered 15 June 1972. Remaining for disposition are plaintiffs' contentions that the management of the Indiana Boys School violates Indiana statutes governing the treatment of juveniles in defendants' custody as well as a right to rehabilitative treatment secured by the United States Constitution.

Following oral argument at the conclusion of a three-day evidentiary hearing, the parties and amicus filed Court-requested briefs on the issue of the right to treatment. The defendants further complied with the Court's Order requiring their subsequent filing of a report detailing the treatment program employed at the Boys School as it had been applied to these named plaintiffs.

During the course of the past six years the Supreme Court has considered a number of cases covering various aspects of the juvenile justice system. Each of these cases discussed the extent to which juveniles are entitled to the same constitutionally protected procedural safeguards which are accorded adult criminal offenders. The recent case of McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), holds that juvenile offenders are not entitled to jury trials. Writing for the majority, Justice Blackmun summarizes the Court's findings in its previous cases and concludes that the unique mission of the juvenile justice system compels that only some of the procedural due process rights attach to juvenile proceedings. Citing In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), the Court, in *McKeiver*, notes that use of a jury would make the adjudication process fully adversary, thereby restricting the juvenile court's prospect of being "intimate, informal [and] protective". *McKeiver, supra,* 403 U.S. at 545, 91 S.Ct. 1976, 29 L.Ed.2d 647. The Court in In re Winship held that juveniles are entitled to a criminal standard of proof and rejected the argument that the criminal standard would jeopardize ". . . the opportunity during post-adjudicatory or dispositional hearing for a wide-ranging review of the child's social history *and for his individualized treatment . . . ." Winship, supra,* 397 U.S. at 366, 90 S.Ct. at 1074.

(Our emphasis.) Commenting upon the District of Columbia's Juvenile Court Act, found to be "like that of other jurisdictions", the Court in Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966) says:

> "The Juvenile Court is theoretically engaged in determining the needs of the child and of society rather than adjudicating criminal conduct. The objectives are to provide measures of guidance and rehabilitation for the child and protection for society, not to fix criminal responsibility, guilt and punishment." *Id.* at 554, 86 S.Ct. at 1054.

Implicit in the above-cited authorities is the proposition that juvenile offenders are entitled to rehabilitative efforts. With the passage of time, the dilemma posed by Justice Fortas in *Kent, supra,* has taken on a new perspective. Justice Fortas remarked in the 1966 case that ". . . [the juvenile offender] receives the worst of both worlds: that he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children." *Kent, supra,* at 556, 86 S.Ct. at 1054.

Today one may forcefully argue that the offender is more secure with additional pre-dispositional procedural safeguards. However, the very cloth from which these recognized rights are cut suggests the need for a post-dispositional attempt to treat and rehabilitate the offender. The procedural rights now accorded a juvenile are patterned in large part by their impact upon the *parens patriae* underpinning of the juvenile justice system. The Court has sought to balance the juvenile's procedural rights against the dictates of regenerative treatment, and where the asserted procedural right impinges upon the basic and unique premises of the juvenile system, the right is denied. *McKeiver, supra.* In effect, the juvenile offender is not fully protected by all of those rights secured to an adult, and the measure of the juvenile's protection is in large part determined by treatment interests.

In light of the Supreme Court's prior holdings, it would be anomalous to find treatment and rehabilitation of an offender as relevant goals during pre-dispositional phases of the juvenile process but not as to the post-dispositional period. Treatment and rehabilitation represent, in this Court's view, a continuum measured by the period of time the juvenile offender remains in the state's custody.

The legislative intent, as would clearly appear from the statutory framework of the juvenile justice system in Indiana, contemplates much more than bare custody and incarceration. The Indiana Juvenile Court Act, under whose authority these plaintiffs are confined, sets forth as its "purpose and basic principle" the following:

> "The purpose of this act [§§ 9–3201–9–3225] is to secure for each child within its provisions such care, guidance and control, preferably in his own home, as will serve the child's welfare and the best interests of the state; and when such child is removed from his own family, to secure for him custody, care and discipline as nearly as possible equivalent to that which should have been given by his parents." Burns' Ind.Stat.Annot. § 9–3201, IC 1971, 31–5–7–1.

Accordingly, we now hold that plaintiffs are entitled to a right to treatment under the laws of the State of Indiana and the Federal Constitution. We next consider the attendant factual issue.

The Indiana Boys School is a medium security state correctional facility for boys 12 to 18 years of age, an estimated one-third of whom are non-criminal offenders. Although its optimum capacity is something less than 300, the School's population is generally closer to 400

boys. The counseling staff consists of 20 individuals including three psychologists holding under-graduate degrees, and one part-time psychiatrist who spends four hours a week at the institution; the medical staff includes one part-time physician, one registered nurse, and one licensed practical nurse.

The evidence reveals that the staff to inmate ratio for purposes of treatment is approximately one to 30. No specialized training or experience is required of the School's 16 counselors who are charged with developing and implementing individualized treatment programs at the Institution. The evidence suggests that administrative tasks demanded of the counselors occupy more than half of their time, i. e., "paper work" involved with completing forms and reports rather than dealing inter-personally with inmates. The staff psychiatrist's limited time commitment to the Institution confines his duties to short-term crisis intervention; the evidence indicates that he is without the opportunity to manage individual psychotherapy programs. None of the staff psychologists holds a graduate degree, nor is any certified by the state; the four department members principally concern themselves with performing diagnostic services, much of their activity being directed towards supervising in-take behavior classifications.

Effective June, 1971, the School adopted a differential treatment program. Defendants' testimony and written material represent that the Quay Classification System is central to this new approach. The Quay System, on the basis of standardized tests administered to youth upon their admission to the School, identifies four personality and behavior types. Each of the 16 cottages at the School houses 20 to 30 youths, all of whom have been identified as having common personality and behavior patterns.

A team comprised of a general house manager, a counselor, a representative of defendants' educational staff, and a consulting member of the psychology department, services each cottage. According to defendants' regulations, the cottage team is required to meet weekly to evaluate the rehabilitation program of each inmate in the cottage.

The program is structured around a contract notion. Following admission to a cottage, each inmate agrees to improve his behavior in four areas of institutional life denominated, "cottage", "recreation", "school", and "treatment". The first category generally concerns a given responsibility for physical maintenance of the residential area; the second involves social and athletic activities; the third concerns reaching specified levels of academic or vocational skills; and the last suggests improved personality goals. As each of four successive "contracts" is fulfilled, the youth is granted additional institutional privileges, ultimately culminating in a parole date.

Example case histories of inmates chosen and filed by the defendants pursuant to Court order reflect that implementation of the program falls far short of its goals. It was admitted during the course of the trial that the Quay System is a means of classifying personality and bahavior patterns and is not treatment. Accordingly, the Court's attention must focus upon the care afforded a youth following his initial classification and assignment to a cottage.

 The case histories of plaintiff-inmates supplied by these defendants suggest that very little in the way of individualized treatment programs are even prepared, much less implemented at the School. It is unclear exactly how much time is spent in individual counseling of inmates. In short, the defendants' program of treatment appears to be more form than substance. The record suggests, and the Court now concludes, that defendants have failed to provide the minimal efforts of treatment and rehabilitation.

The Court is not unmindful of the very great burden it confronts in fashioning a specific remedy pursuant to these general findings. The facts and events arising from the instant cause are the product of an antiquated system which has been permitted to grow behind a screen of public indifference and political neglect. The Court sees its present function as steering a middle course between the indefensible extreme of abstinence and the impossible extreme of superintending the system. This passage would be eased by the full cooperation of the litigants; hopefully all parties are now willing to share in a dialogue leading to the construction of viable treatment goals for the youths housed at the Indiana Boys School.

At the present juncture of the instant proceedings, the Court feels unprepared to issue final relief. The few days of an evidentiary hearing were sufficient to provide the Court with a basis for its rulings as to liability but not as to determining relief. Neither party has had a full opportunity to present an organized view of alternative treatment programs. The issues involved are most complicated, touching upon a great multitude of aspects in the juvenile justice system; they require a thorough and time-consuming presentation. Defendants' proposed reforms directed by this Court in its order of 15 June 1972 should be incorporated within a general treatment program outline.

These circumstances prompt the Court to order that no later than 1 July 1973, each of the parties shall, consistent with the Court's rulings, file proposed specific findings of fact and conclusions of law with respect to acceptable, minimal, constitutional standards of treatment at the Indiana Boys School. Each party shall be allowed 30 days thereafter in which to file simultaneous briefs on the findings and conclusions and 15 days thereafter in which to make further reply. The Court shall then issue its final decree.