Charles Dennis SMITH, Appellant,

v.

The STATE of Texas, Appellee.

No. 14737.

Court of Civil Appeals of Texas.

San Antonio.

July 30, 1969.

Rehearing Denied Sept. 17, 1969.

Harry B. Adams, III, John L. Sanders, Karl L. Rubinstein, San Antonio, for appellant.

James E. Barlow, Criminal Dist. Atty., Sparta Bitsis, Asst. Criminal Dist. Atty., San Antonio, for appellee.

CADENA, Justice.

Appellant, a child adjudged delinquent and facing confinement in the State training school for boys for a period not extending beyond his twenty-first birthday— a period of almost five years—complains of the action of the district court denying his application for a writ of habeas corpus and ordering his return to the school. He argues that he faces confinement for a period of almost five years for carrying a switch-blade knife; that an adult who engaged in the same conduct could not be confined for a period in excess of one year and might escape with no more than the payment of a fine;[1] and that this difference in the authorized period of confinement solely because of his tender years denies him the equal protection of the laws and deprives him of his liberty without due process of law in violation of the Fourteenth Amendment to the Constitution of the United States.

In Texas, as in perhaps all other states, where confinement is deemed necessary in the case of a delinquent child, the child is committed to an institution for an indeterminate period not extending beyond his twenty-first birthday.[2] Stated simply,

---

1. Vernon's Ann.P.C. Art. 483 prescribes a punishment for adult violators of a fine not exceeding $500.00, or imprisonment for not more than one year, or both such fine and imprisonment.

2. Under the provisions of Vernon's Ann. Tex.Rev.Civ.Stat. Art. 2338–1, § 13(c) (2), upon a finding of delinquency the court, if it determines that confinement is desirable, commits the child to "a suita-

the authorized period of confinement depends solely on the age of the child—the younger the child, the longer the permitted period of detention. Such factors as the child's background, his previous history of anti-social conduct, his response to rehabilitative programs, if any, not involving confinement,[3] and the seriousness of the conduct, criminal or otherwise,[4] upon which the finding of delinquency is based, are irrelevant in determining the length of the period during which he may be held.[5] Conceivably, a child of ten may be kept in an institution for eleven years for conduct which would subject an adult to no more than a fine or confinement for a few days or months.[6]

No citation of authority is required in support of the statement that a State may classify its citizens for various purposes, for to deny to government the power to classify is to divest it of the power to legislate intelligently. Since classification is a necessity, and since discrimination is the fortuitous result of classification in legislation, it is clear that a statute cannot be branded constitutionally offensive merely because it singles out a class of persons for disparate treatment which is more oppresive than non-members of the class must tolerate. As sometimes said, the Equal Protection Clause does not require that things different in fact be treated in law as though they were the same.[7] It does not require

ble public institution or agency * * * for an indeterminate period of time, not extending beyond the time the child shall reach the age of twenty-one years." Under the provision of Sec. 12 of Art. 5143d (all references to statutes are, unless otherwise indicated, to Tex.Rev.Civ.Stat. Ann.) a child adjudged delinquent and not released, placed on probation, or placed in a private institution or agency, the court shall commit him to the Texas Youth Council. Every child committed to the Youth Council, if not previously discharged, shall be discharged from custody of the Youth Council when he reaches his twenty-first birthday. Art. 5143d, § 31.

3. The alternatives to commitment to the Youth Council are placement of the child on probation or under supervision in his own home or in the custody of a relative or other fit person, upon such terms as the court shall determine; or commit the child to a suitable private institution or agency authorized to care for children; or place the child in a suitable family home; or make such other disposition as the court may deem to be for the best interest of the child. Art. 2338–1, § 13(c). The Youth Council, upon receiving a delinquent child, is under the duty to examine the child and make an investigation of "all pertinent circumstances of his life and behavior." The Council may permit the child his liberty under supervision and upon such conditions as are believed conducive to acceptable behavior; or order his confinement under such conditions as are believed best

designed for the child's welfare and the interests of the public; or order reconfinement or renewed releases as often as conditions indicate to be desirable; or discharge him from control when it is believed that such discharge will best serve the child's welfare and the protection of the public. Any order of the Council affecting a child, other than an order of final discharge, may be revoked or modified as often as conditions indicate to be desirable. Article 5143d, §§ 16, 17.

4. A finding of delinquency is authorized where the child "habitually so deports himself as to injure or endanger [his] morals or health." Art. 2338–1, § 3(f).

5. Presumably, these factors are considered in determining whether confinement is desirable. See Art. 5143d, § 16.

6. In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), is a good example of the potential inequality. There the child was ordered confined for a maximum period of six years for an offense which, if committed by an adult, carries with it a maximum punishment of a fine of not less than $25.00 and not more than $50.00, or imprisonment for not more than two months. In Texas, a finding of delinquency could be based on the fact that the child habitually associates with prostitutes, Art. 2338–1, § 3(g). An adult committing the same offense would face only a fine not exceeding $200.00. Tex.Ann.P.C. Arts. 607, 608.

7. Tigner v. Texas, 310 U.S. 141, 147, 60 S.Ct. 879, 84 L.Ed. 1124 (1940).

equal treatment for all persons without recognition of differences in relevant circumstances.

■ Where a class is selected for differential treatment, the pertinent inquiry concerns the existence of some reasonable nexus between the classification adopted and a valid governmental objective. A classification is invulnerable to an "equal protection" attack if it is reasonable, and a classification is reasonable if it includes all persons who are similarly situated with respect to the law.[8]

In dealing with equal protection problems raised by legislative classifications, the Supreme Court of the United States has used at least two different approaches. In some cases, such as those involving taxation or regulation of economic activity, a classification will be upheld unless it is palpably arbitrary, irrational or capricious.[9] According to this test, which may be designated as "permissive review," a statute will be upheld if any state of facts may reasonably be conceived which would sustain the rationality of the classification.[10] This standard assigns to the Legislature the primary responsibility for evaluating the relevant facts and results in a judicial tolerance of a rather loose relationship between the classifying trait and the legislative purpose, without inquiring whether the social benefits resulting from the statute are important enough to justify the burdens imposed upon the affected class.[11] Perhaps the most important practical effect of this method of inquiring into the reasonableness of a classification is that it places upon the person attacking the statute the burden of demonstrating that the classification is utterly lacking in rational justification.[12]

If, in considering appellant's contentions, we adopt this restrained or permissive mode of review, we must conclude that appellant's contentions are without merit. The purpose of our statutes relating to the handling of youthful offenders is, as in other states having juvenile court systems, the education, treatment and rehabilitation of the child, rather than retributive punishment.[13] The em-

---

8. Tussman & tenBroek, The Equal Protection of the Laws, 37 Calif.L.Rev. 341, 345–46 (1949). It has been asserted that a classifying statute is unobjectionable if it applies equally to all within the statutory class. Powell v. Pennsylvania, 127 U.S. 678, 687, 8 S.Ct. 992, 32 L.Ed. 253 (1888). But this approach would render the Equal Protection Clause practically meaningless, since it would lead to the conclusion that the requirement of equal protection is satisfied if the statute applies equally to all persons to whom it applies. A statute providing that no Republican should be allowed to hold public office would be upheld because it treats all members of the statutory class equally. This restrictive view of the effect of the Equal Protection Clause has been rejected. "Judicial inquiry under the Equal Protection Clause, therefore, does not end with a showing of equal application among the members of the class defined by the legislature." McLaughlin v. Florida, 379 U.S. 184, 191, 85 S.Ct. 283, 288, 13 L.Ed.2d 222 (1964).

9. Metropolis Theater Co. v. City of Chicago, 228 U.S. 61, 68, 70, 33 S.Ct. 441, 57 L.Ed. 730 (1913).

10. McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

11. The lengths to which a court will go in reasonably conceiving a state of facts which would justify the legislation will, of course, vary with the imaginative powers of the judges. The Supreme Court has been able to find a reasonable nexus between the promotion of public safety and nepotism in the selection of river boat pilots. Kotch v. Bd. of River Port Pilot Com'rs., 330 U.S. 552, 67 S. Ct. 910, 91 L.Ed. 1093 (1947). See also Goesaert v. Cleary, 335 U.S. 464, 69 S. Ct. 198, 93 L.Ed. 163 (1948).

12. Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911).

13. "The purpose of this Act is to secure for each child * * * such care, guidance and control, preferably in his own home, as will serve the child's welfare and the best interest of the state; and when such child is removed from his own family, to secure for him custody, care and discipline as nearly as possible equivalent to that which should have

phasis on training and rehabilitation, rather than punishment, is underscored by the declaration that juvenile proceedings are civil, rather than criminal, in nature.[14] Instead of a complaint or indictment we have a "petition."[15] The hearing never results in a conviction, but may lead to an "adjudication of delinquency."[16] Where confinement of the delinquent child is indicated as the proper treatment, the child is not sentenced to prison but, instead, is "committed" to a "training school."[17] The adjudication of delinquency does not carry with it any of the civil disabilities ordinarily resulting from conviction of crime, nor is the child considered to be a criminal because of such adjudication.[18]

■ Since the purpose of the legislation is to salvage youthful offenders, it requires no straining of the judicial imagination to find the existence of a reasonable relationship between the legislative purpose and the use of age as the classifying trait. It is indisputably the province of the Legislature to determine the manner in which various offenders will be treated, and if the difference in treatment is founded upon an arguably rational basis, the legislative decision is determinative.[19] The Legislature could reasonably have concluded that children, as a class, should be subject to indefinite periods of confinement, not to extend beyond their twenty-first birthday, in order to insure sufficient time to accord the child sufficient treatment of the type required for his effective rehabilitation. This conclusion might be based on physiological and psychological differences between children and adults, the types of crimes committed by children, their relation to the criminal world, their unique susceptibility to rehabilitation, and their reaction, as a class, to confinement and discipline, as well as reformative treatment. It is true that some or all of these conclusions are based on sociological, psychological and penological theories which are not universally agreed on among so-called social scientists, but the fact that eminent scholars believe such theories to be valid prevents us from branding them as palpably irrational.

Since appellant has produced no data refuting the legislative conclusion that children who engage in deviant conduct require a different type and manner of con-

been given him by his parents." Art. 2338–1, § 1. "The purpose of this Act is * * * to provide a program of constructive training aimed at rehabilitation and reestablishment in society of children adjudged delinquent by the courts of this state and committed to the Texas Youth Council, and to provide active parole supervision for such delinquent children until officially discharged from custody of the Texas Youth Council." Art. 5143d, § 1. The purpose of the training schools, "and of all education, work, training, discipline, recreation, and other activities carried on in the schools and other facilities shall be to restore and build up the self-respect and self-reliance of the children and youth lodged therein to qualify them for good citizenship and honorable employment." Id., § 21.

14. "Courts have held this proceeding to be a civil, and not a criminal, proceeding having as its purpose to protect the * * * delinquent child at the most critical time of his life, and is not intended to convict and punish juveniles, but to guide and direct them." In re Gonzalez, 328 S.W.2d 475, 477 (Tex.Civ. App.—El Paso 1959, writ ref'd n.r.e.).

15. Art. 2338–1, § 7. In some jurisdictions, the penchant for euphemism has been carried to the extent that the petition is regarded as being filed "on behalf of" the child. Neumeyer, Juvenile Delinquency in Modern Society, 253 (1949).

16. Art. 2338–1, § 13(c).

17. Id., § 13(c) (2) ; Art. 5143d, § 12.

18. Art. 2338–1, § 13(d).

19. Jensen v. Gladden, 231 Or. 141, 372 P. 2d 183, 195 (1962).

finement than do adult criminals, the presumption of validity with which the permissive method of review shields the statute remains unpierced.

However, in some cases, the Supreme Court of the United States has applied a stricter standard, demanding more than a conceivable rational relationship between the classification and the statutory purpose. In these cases, the statute is subjected to "the most rigid scrutiny," [20] and the ordinary presumption of constitutionality seems to melt away, so that the burden is on the person defending the statute to show a substantial, empirically grounded justification to support the differentiation.[21]

Statutory classifications have been subjected to this rigid scrutiny, at least ostensibly, in cases where the classification is based on one of certain "suspect" traits

and the statutory class is subjected to disparate treatment which impinges seriously on personal rights considered as "fundamental." [22]

■ Strict or "active" review results from the interaction of these two factors—suspect classification and serious impingement of fundamental personal liberties. Thus, if the classification is of the type considered highly suspect, such as a classification based on race, the statute will be subjected to close scrutiny even though the interest affected is not regarded as meriting a high position in the hierarchy of protected personal interests. On the other hand, the fact that the classification is relatively free from suspicion will not result in the application of a restrained or permissive standard of review if the operation of the statute seriously affects interests high on the list of the so-called "fundamental liberties." [23]

20. Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194 (1944).

21. Loving v. Virginia, 388 U.S. 1, 8–9, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); McLaughlin v. Florida, 379 U. S. 184, 196, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); Developments in the Law— Equal Protection, 82 Harv.L.Rev. 1067, 1087–1123 (1969).

22. "The decision seems to rest upon two largely subjective judgments. * * * One element is the relative invidiousness of the particular differentiation, such as between men of different race, farmer and city dweller, rich and poor, literate and illiterate, or men and women. The second element is the relative importance of the subject with respect to which equality is sought, such as the vote, the defense of a criminal prosecution, or civil litigation." Cox, The Supreme Court, 1965 Term. Foreqord, Constitutional Adjudication and the Promotion of Human Rights, 80 Harv.L.Rev. 91, 95 (1966).

It has been suggested that some traits are not merely "suspect," but impermissible so that they may never be made the basis for classification. See Mr. Justice Rutledge, dissenting, in Kotch v. Bd. of River Port Pilot Com'rs., 330 U.S. 552, 565, 67 S.Ct. 910 (1947). This view

seems indefensible. Even race, probably the most suspect classifying trait, has been validly used, according to the Supreme Court, as the basis for designating the class of persons to be forcibly relocated and held in detention camps. Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193 (1944).

" * * * an attempt at an exhaustive listing of suspect classifications would be pointless. It suffices to say that this is of necessity a rather loose category. Its content, at any particular time, will depend upon the area in which the concept of equality is struggling against the recurring forms of claims to special and unequal status—whether along racial, religious, economic or even political lines." Tussman & tenBroek, The Equal Protection of the Laws, 37 Calif.L.Rev. 341, 356 (1949).

23. See Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1065, 1120– 21, 1127–31 (1969). Thus, the requirement of the payment of a small fee as a prerequisite to admission to a fencing match between representatives of two state-supported universities might encounter no serious constitutional obstacle, since a classification based on ability to pay a fee is not ordinarily viewed with suspicion, and the right to witness a fencing match is not regarded as a basic

Classifications based on age are no strangers to our law. Especially familiar are laws designed for the protection of children, such as those prohibiting the sale of intoxicants to minors. Although classifications based on age have sometimes been struck down,[24] our attention has been called to no case indicating that age is a suspect basis for classification.

If, then, a strict standard of review is to be applied in this case, the reason must be that the legislation in question seriously impinges on an important fundamental right. It might persuasively be argued that a statute which permits longer confinement of children does impinge on fundamental personal liberties, although, in the area of criminal law, courts have traditionally allowed legislatures considerable leeway in classifying offenses and offenders for sentencing purposes.[25] Apparently, it has not been thought that the possibility of a longer period of confinement, standing alone, calls for a strict standard of review.[26]

If the purpose of permitting longer periods of detention for children was to punish youthful offenders more severely than adult criminals, the application of a strict standard of review would seem justified. But where the legislative purpose is to benefit the affected class, a less strict standard would seem proper. We are familiar with the literature reflecting disillusionment concerning the practical administration of the rehabilitative ideal,[27] and the burgeoning literature of criticism of the juvenile system in this country.[28] But, as the Texas Supreme Court pointed out only a few days ago, "while we must accept as true much of the dismal picture painted in *Gault* as to the abuses of the juvenile system, we cannot condemn out of hand the Texas Youth Council, the juvenile judges, and other trained people working in this field. The policy of the juvenile laws has been fixed by the Texas Legislature; and we con-

right. But if the classifying trait is race, rather than ability to pay, there can be no doubt that the regulation would fall, despite the relative unimportance of the right affected. Again, a statute which conditions the right to vote on the payment of a small fee is invalid, despite the fact that a classification based on economic status might have a rational connection to the purpose of securing a qualified electorate. Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). In the voting case, the hostile attitude of the Supreme Court would seem to have been engendered by the importance of the right affected, even though the classifying trait was relatively free from suspicion.

24. E. g., State ex rel. Greenberg v. Erickson, 159 Minn. 287, 198 N.W. 1000 (1924). There a statute exempting persons under 21 from the requirement of a license for the privilege of hunting and fishing was held unreasonable.

25. Skinner v. Oklahoma, 316 U.S. 535, 540, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); Com. of Pennsylvania ex rel. Sullivan v. Ashe, 302 U.S. 51, 58 S.Ct. 59, 82 L.Ed. 43 (1937).

26. An exception is Commonwealth v. Daniel, 430 Pa. 642, 243 A.2d 400 (1968), holding that a statute imposing longer sentences on women than on men convicted of the same offense was a denial of equal protection. Prior to the Daniel decision the courts were consistent in upholding the imposition of longer periods of confinement, via the indeterminate sentence or commitment route, on women and youthful offenders. Rubin, Disparity and Equality of Sentencing, 40 F.R.D. 55, 76 (1966); Note, 82 Harv.L.Rev. 921, 924 (1969).

27. See, generally, Kadish, Legal Norms and Discretion in the Police and Sentencing Processes, 75 Harv.L.Rev. 904 (1962); Putney & Putney, Origins of the Reformatory, 53 J.Crim.L., C. & P. S. 427 (1962).

28. The opinion in In re Gault, 387 U.S. 1, 87 S.Ct. 1428 (1967), is profusely footnoted to modern scholarship, both legal and sociological, pointing out the discrepancies between theory and actual practice.

**948**

ceive it to be our duty to uphold the spirit of that law * * *." [29]

 The purpose of our juvenile laws is benign, rather than invidious. Whether the law is actually beneficial to the affected class is a question which is not susceptible of easy judicial determination. The determination of the beneficial effects of our system depends, at least in part, on complicated factual judgments of whether our juvenile program helps or impedes the salvation of child offenders. It is not necessary, in this case, to hold that the required judgment is of the sort that should be left to the political processes. But we do hold that, in the absence of at least some data indicating that the legislative promise of treatment rather than punishment is not, in fact, being kept, we shoud not attempt, by a reasoning process alone, to determine whether the promised benefits are, in fact, being accorded to juvenile offenders.

If, in fact, in Texas the term "training school" is but a euphemism for prison; if the promised "treatment" consists of nothing more than confinement and disciplinary measures not substantially different from those characteristic of our adult penitentiaries; if, in fact, what is called rehabilitative treatment is indistinguishable from ordinary penal confinement in caged and demoralizing idleness, then, perhaps, a court would not be unwilling to cut through the verbal camouflage and condemn the system because of the exposed realities. But the record before us is bare of any indication that the promise of treatment and rehabilitation has been broken, and that the legislative declaration of purpose is no more than cant and hypocrisy used to justify what is essentially a system that does no more than provide longer terms of imprisonment for children.[30]

The judgment of the trial court is affirmed.

29. State v. Santana, Tex., 444 S.W.2d 614 (decided July 23, 1969).

30. Cf. Bazelton, Justice for Juveniles, in Steele (ed.), New Light on Juvenile Delinquency, 188–196 (1967).