Alicia **MORALES** et al.

v.

James **TURMAN, Individually and in his official capacity as Executive Director of the Texas Youth Council, et al.**

**Civ. A. No. 1948.**

United States District Court,
E. D. Texas,
Sherman Division.

Aug. 31, 1973.

See also, D.C., 59 F.R.D. 157.

Peter Sandmann, Youth Law Center, San Francisco, Cal., Steven L. Bercu, Richardson, Tex., William P. Hoffman, Jr., Washington, D. C., for plaintiffs.

John L. Hill, Atty. Gen. of Tex., Austin, Tex., Robert Salter, Staff Atty., Gatesville, Tex., Larry York, Joe B. Dibrell, Jr., Max P. Flusche, Jr., and Thomas W. Choate, Asst. Attys. Gen., Austin, Tex., for defendants.

Louis M. Thrasher, Michael Lottman, William Malcolm Logan, Jr., Daniel E. Maeso, and Michelle White, Attys., Civil Rights Div., Dept. of Justice, Washington, D. C., for the United States, amicus curiae.

Larry A. Schwartz, Patricia Wald, Attys., Mental Health Law Project, Washington, D. C., for American Orthopsychiatric Assn., American Psychological Assn., and American Assn. on Mental Deficiency, amici curiae.

JUSTICE, District Judge.

## FINDINGS OF FACT

1. Plaintiffs are minor children who represent a class consisting of all juveniles (hereinafter juveniles or TYC inmates) who are presently, have been in the past, or may be in the future adjudicated delinquent pursuant to Vernon's Tex.Rev.Civ.Stat.Ann. art. 2338-1, involuntarily committed to the custody of the Texas Youth Council (hereinafter the TYC), pursuant to Tex.Rev.Civ.Stat. Ann. art. 5143d, and assigned to one of the six schools under the jurisdiction of the TYC: Mountain View, Gatesville, Giddings, Gainesville, Crockett, and Brownwood. (The names of these schools correspond to the names of the Texas cities in which they are located, except for Mountain View, which is located near Gatesville, Texas.)

2. Defendants are Dr. James A. Turman, Executive Director of the TYC, members of the TYC appointed by the Governor with the consent of the Senate, and various employees of the TYC responsible for the supervision of the above-described schools (hereinafter TYC personnel).

3. The Mountain View State School for Boys is a maximum security facility operated by the TYC. It is surrounded by two fences, both of which are topped with barbed wire. A juvenile may be initially assigned to Mountain View as a

result of a staff determination that his pre-commitment conduct evinces dangerous propensities or he may be transferred there from one of the other TYC institutions for boys, usually Gatesville, as a result of a decision that his conduct is unsatisfactory. Thus, there are at least some boys incarcerated at Mountain View whose delinquent behavior consists of such "status" offenses as truancy, incorrigibility, or running away from home. There are also some boys at Mountain View who were transferred there from other schools for such essentially nonviolent, uncooperative behavior as swearing at correctional officers, refusing to work, or running away.

4. The decision whether to initially assign a boy to Mountain View or to transfer him to Mountain View from one of the other institutions for boys is made by a classification committee. Many of the persons on the committee have no knowledge of Mountain View, and no firm criteria exists to guide their decision. Time limitations make adequate psychiatric examination difficult, if not impossible; deliberations are carried on in the boys' absence; and boys are not informed of the committee's decision prior to the actual assignment or transfer.

5. Correctional officers at Mountain View presently administer, or have in the past administered, various forms of physical abuse, including slapping, punching, and kicking. One form of this physical abuse, referred to as "racking," consists of requiring the inmate to stand against the wall with his hands in his pockets while he is struck a number of times by blows from the fists of correctional officers. Other abuse consists of correctional officers administering blows to the face with both open and closed hands.

No testimony was adduced to justify this punishment on the grounds of protecting persons or property. Certain employees of the TYC have consistently engaged in this abuse of the juveniles in their care. As a result of these practices, the climate at Mountain View is one of repression and fear. The administrative staff of Mountain View and the central office of the TYC have been less than diligent in their efforts to eradicate these practices at Mountain View, with the result that inmates of Mountain View do not feel secure in reporting brutal conduct on the part of correctional officers to higher authorities.

6. Tear gas and similar chemical substances have been used by agents or employees of the defendants on Mountain View inmates in situations in which no riot or other disturbance was imminent. One inmate, for example, was tear-gassed while locked in his cell for failure to work; another was gassed for fleeing from a beating he was receiving; and another was gassed by a correctional officer supervisor while he was being held by two 200-pound correctional officers.

7. Mountain View's history, well-known to the inmates of both Mountain View and Gatesville, has been one of brutality and repression. Its reputation has in no small part been a function of ineffective leadership and a staff unqualified by education, experience, or personality to effect the rehabilitation of delinquents. Mountain View cannot be operated as a minimally adequate facility without a competent and sensitive Superintendent.

8. Correctional officers at institutions other than Mountain View, primarily Gatesville, presently administer, or have in the past administered, various forms of physical abuse to TYC inmates, including slapping, punching, and kicking.

9. Complaints regarding physical abuse of TYC inmates at Mountain View and other institutions are supposed to be the subject of "incident reports," filed by all TYC inmates and personnel involved. Specific procedures vary from one institution to another, however, and falsification of reports by correctional officers particularly at Mountain View, and by inmates, under duress of the correctional officers, is widespread. Many

correctional officers force an inmate to file a report that reflects that an injury was caused by a football game, for example, rather than by the use of force by the correctional officer. Moreover, many inmates testified to fear of reprisals by correctional officers for the truthful reporting of instances of physical abuse.

10. Some Mountain View inmates are segregated from the general population on the basis of purported homosexuality and race. Two dormitories, referred to by TYC inmates and personnel as "punk dorms," are set aside for the smaller boys and for those determined by the custodial staff, on the basis of nonclinical standards, to be homosexuals. One dormitory is for black inmates, and the other is for Anglo and Mexican-American inmates. Experts testifying for both the plaintiffs and the defendants and the various amici groups were unanimous in concluding that the permanent segregation of inmates on the basis of purported homosexuality was psychologically damaging. Some juveniles, however, have already been stigmatized and identified as purported homosexuals by being placed in one of the so-called "punk dorms." It is apparent that immediate and indiscriminate return of these juveniles to the general population would pose a danger to their safety.

11. The average length of stay for TYC inmates at Mountain View is approximately a year and a half, at least fifty percent longer than the average length of stay for inmates at either of the other boys' institutions.

12. Experts testifying for the plaintiffs, the various amici groups, and the defendants, except for certain TYC personnel, were unanimous in concluding that only a very small percentage of juveniles adjudged delinquent should be placed in a maximum security facility.

13. In order that the provisions of this order be understood and observed by all persons employed at Mountain View, which institution has the worst history of brutality and repression of any TYC facility, it is necessary that a person trusted by Mountain View inmates be appointed to serve as an Ombudsman to whom inmates and staff may go with grievances and to whom all meetings and records touching upon the operation of Mountain View or the assignment of juveniles to Mountain View are open. It is necessary that this Ombudsman be empowered to report directly to the court any violations of its order and to make recommendations to TYC concerning compliance with the order.

14. Mr. Charles Derrick, presently Chief of Casework Services at Mountain View, enjoys the confidence of both administration and inmates, as evidenced by the agreement of all the parties in this civil action that he serve during the course of litigation as an Ombudsman to protect the rights of juveniles who were witnesses in the case.

15. Juveniles at many or all of the TYC institutions are subject to placement in security facilities, variously called "Security Treatment Center," "Special Treatment Cottage," "STC," or similar designations. In at least some of the institutions, the infirmary is used occasionally as a security facility.

16. Juveniles are, or have been in the past, confined to security facilities for conduct that is not seriously disruptive of the institution's program and for conduct that poses no threat to the safety of any person or to the preservation of valuable property.

17. Most or all of these security facilities contain single rooms or cells in which juveniles are, or have been in the past, locked for periods of time as long as a month or more, with no opportunity to leave the cell except for daily bathing, hygiene, and eating. Many juveniles so confined have little or no contact with casework, medical, or psychological staff during the period of their confinement.

18. In some institutions, inmates are locked into cells to which no person in the immediate vicinity has a key; in the event of an emergency, the key to the cell must be secured from a person who is

not in the building and who may not arrive with the key for a period of several minutes.

19. In some institutions, inmates confined to a security facility or placed in solitary confinement receive very little or no educational instruction during the period of their confinement. They are ordinarily not allowed to attend regular school classes, but may receive instruction from special tutors who visit the facility or may work independently on assigned material. Sometimes they are not even permitted access to school materials.

20. Inmates in some security facilities have been forced to perform repetitive, make-work tasks, such as pulling up grass without bending their knees or buffing a floor for hours with a rag. During the pendency of this lawsuit, inmates were permitted to adopt a kneeling posture, rather than a bending posture with unbent knees, for the performance of the grass-pulling.

21. Inmates in some security facilities are forbidden to sleep except during certain hours, and are penalized by longer confinement or physical punishment if they fall asleep during hours when sleeping is not permitted. This rule is enforced even against inmates who are taking regular doses of medication that induces drowsiness.

22. Some inmates are, or have been in the past, confined to cells that are almost bare of furnishing and do not contain the minimum bedding necessary for comfortable and healthful sleep.

23. Inmates in some security facilities are, or have been in the past, instructed that they may not speak for the duration of their confinement except to answer when spoken to.

24. Experts were unanimous in their opinion that solitary confinement of a child in a small cell is an extreme measure that should be used only in emergency situations to calm uncontrollably violent behavior, and should not last longer than necessary to calm the child. Experts also agreed that the child should not be left entirely alone for long periods, but that some person should check on the child at frequent intervals and be responsible for making the solitary confinement a constructive rather than a punitive effort. Experts also testified that often confinement of a child to his own dormitory room for a short period succeeds in calming him and restoring order to the environment.

25. Experts testified that prolonged confinement of a child to a single building can be harmful unless the child is receiving a great deal of attention during the time of confinement. Experiments in sensory deprivation have shown that the absence of many and varied stimuli may have a serious detrimental effect upon the mental health of a child.

26. In some institutions, doors to the dormitory rooms are either locked or chained as a matter of course during certain hours of the day and throughout the night. Sometimes inmates are not permitted access to regular bathroom facilities but must use a chamber pot in their rooms if they cannot wait until the designated hour for use of the bathroom.

27. Experts testified that denying a child access to a regular bathroom whenever he needs it is demeaning and unnecessary. Experts also testified that the practice of confining inmates to their dormitory rooms as a matter of course is damaging to a child's self-respect and physical development.

28. The incoming and outgoing mail of inmates, except that to or from attorneys, is subject to being read or censored, in one form or another, in at least some of the TYC institutions. Similarly, many of the institutions retain policies in one form or another regarding the number and length of letters that inmates may write and limitations on the persons to whom they may write.

29. The speaking of Spanish by inmates is, or has been in the past, discouraged and has been in the past the subject of disciplinary action by TYC

personnel. Approximately 23.9% of the inmates in the six TYC facilities involved in this civil action are Mexican-American. Some can speak little or no English.

30. Visitation policies regarding the number of visits, the length of visits, and the number of visitors permitted vary from one institution to another. At most of the institutions, however, families of inmates are encouraged to visit on only one Sunday a month and are permitted to visit at other times only after prior arrangements are made. At the Mountain View School STC, visitation is limited to ten or fifteen minutes a month by the parents.

31. None of the six schools under the jurisdiction of TYC (excepting only Giddings, as to which no evidence was offered) has available a registered nurse available on the premises on a 24-hour basis.

32. TYC institutions have no system to screen psychologically prospective employees to determine their suitability for working with children. Former Mountain View correctional officers testified that they were hired after only a ten-minute interview with the assistant superintendent and no further screening. A psychologist at the Gatesville Reception Center and a psychological consultant to the Gatesville State School for Boys testified that testing techniques exist to screen out potentially abusive prospective employees and that psychologists at Gatesville are equipped to administer such testing.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of this civil action under the first, eighth, and fourteenth amendments to the United States Constitution, 42 U.S.C.A. § 1983, and 28 U.S.C.A. §§ 1331, 1343, and 2201–2202. Pendent jurisdiction also exists to decide questions arising from alleged violations of rights secured by state statutes in the context of this lawsuit. United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). *See generally* Tex. Rev.Civ.Stat.Ann. art. 5119 et seq. (1971).

2. The eighth amendment's prohibition against cruel and unusual punishment applies to state as well as federal government. Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). The protection applies not only to convicted persons but also to non-convicted persons held in custody. Hamilton v. Love, 328 F.Supp. 1182 (E.D.Ark.1971). Juveniles held in state institutions are protected by the eighth amendment. Lollis v. New York State Department of Social Services, 322 F.Supp. 473 (S.D.N.Y.1970).

3. The widespread practice of beating, slapping, kicking, and otherwise physically abusing juvenile inmates, in the absence of any exigent circumstances, in many of the Texas Youth Council facilities, particularly the Mountain View and Gatesville schools, violates state law, Tex.Rev.Civ.Stat.Ann. art. 5130 (1971), the avowed policies of the Texas Youth Council, Tex.Rev.Civ.Stat. art. 5143d § 1 (1971), and the eighth amendment to the United States Constitution. This kind of punishment, which is administered not merely in the absence of legislative authorization, whether express or implied, but rather in express derogation of state law, violates the eighth amendment because it is so severe as to degrade human dignity; is inflicted in a wholly arbitrary fashion; is so severe as to be unacceptable to contemporary society; and finally, is not justified as serving any necessary purpose. *See* Furman v. Georgia, 408 U.S. 238, 257–306, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Brennan, J.); *see also* Jackson v. Bishop, 404 F.2d 511 (8th Cir. 1968).

4. The use of tear gas and other chemical crowd-control devices in situations not posing an imminent threat to human life or an imminent and substantial threat to property—but merely as a form of punishment—constitutes cruel and unusual punishment in viola-

tion of the eighth amendment. Landman v. Royster, 333 F.Supp. 621, 649 (E.D.Va.1971).

5. Placing inmates in solitary confinement or secured facilities, in the absence of any legislative or administrative limitation on the duration and intensity of the confinement and subject only to the unfettered discretion of correctional officers, constitutes cruel and unusual punishment in violation of the eighth amendment. *See* Furman v. Georgia, *supra* at 257–306 of 408 U.S., 92 S.Ct. 2726; *see also* Inmates v. Affleck, 346 F.Supp. 1354 (D.R.I.1972).

6. Requiring inmates to maintain silence during periods of the day merely for purposes of punishment, and to perform repetitive, nonfunctional, degrading, and unnecessary tasks for many hours—the so-called make-work, such as pulling grass without bending the knees on a large tract of ground not intended for cultivation or any other purpose, or moving dirt with a shovel from one place on the ground to another and then back again many times, or buffing a small area of the floor for a period of time exceeding that in which any reasonable person would conclude that the floor was long since sufficiently buffed—constitutes cruel and unusual punishment in violation of the eighth amendment. See Furman v. Georgia, *supra* at 257–306 of 408 U.S., 92 S.Ct. 2726.

7. Racial segregation of any state-operated facility is unconstitutional. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Washington v. Lee, 263 F.Supp. 327 (M.D.Ala.1966).

8. The initial placement or subsequent transfer of inmates to Mountain View, the maximum security unit, absent any attempt through a hearing that comports with minimal due process requirements to determine which of the juvenile offenders pose a danger to society, constitutes a violation of the fourteenth amendment. *See, e. g.,* Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Cal.1971).

9. Although the limitation on permissible censorship of the mail of adult prisoners remains uncertain, it is clear that any restrictions upon the important first amendment freedom of communication must bear, at the very least, a rational relationship to the advancement of a legitimate state interest. *See, e. g.,* Nelson v. Heyne, 355 F. Supp. 451, 457–58 (N.D.Ind.1972); Palmigiano v. Travisono, 317 F.Supp. 776 (D.R.I.1970). The defendants have advanced no legitimate state interest, much less a compelling interest, that is served by the reading or censoring of incoming or outgoing mail or by limitation of the persons with whom inmates may correspond. A legitimate state interest in preventing the flow of contraband into Texas Youth Council institutions justifies only the least restrictive practices adequate to achieve that interest—in this case, the opening of incoming mail in the presence of the inmate to whom it is addressed for the sole purpose of examining it for contraband. Nelson v. Heyne, *supra.*

10. The practice of prohibiting or discouraging juveniles in TYC institutions from conversing in languages other than English, under circumstances that would not give rise to similar prohibitions on the speaking of English, is a violation of the first amendment to the Constitution.

11. The law of the state of Texas requires that the TYC adhere to its statutory duty to provide "a program of constructive training aimed at rehabilitation and reestablishment in society of children adjudged delinquent." Tex. Rev.Civ.Stat.Ann. art. 5143d § 1 (1971). This law confers upon each juvenile committed to the custody of the Texas Youth Council a right to humane and rehabilitative treatment directed toward the ultimate purpose of reintegrating the child into society. *See* Smith v. State, 444 S.W.2d 941, 948 (Tex.Civ. App.—San Antonio 1969, writ ref. n. r. e.); In re Gonzalez, 328 S.W.2d 475

(Tex.Civ.App.—El Paso 1959, writ ref. n. r. e.).

 In addition to this state statutory right, the commitment of juveniles to institutions under conditions and procedures much less rigorous than those required for the conviction and imprisonment of an adult offender gives rise to certain limitations upon the conditions under which the state may confine the juveniles. This doctrine has been labelled the "right to treatment," and finds its basis in the due process clause of the fourteenth amendment. *See, e. g.,* Nelson v. Heyne, *supra* at 459 of 355 F.Supp.; Inmates v. Affleck, *supra; see also* Wyatt v. Stickney, 325 F. Supp. 781 (M.D.Ala.1971) (mental institutions), discussed in '86 Harv.L.Rev. 1287 (1973). Thus juveniles committed to the custody of the Texas Youth Council enjoy both a state statutory and a federal constitutional "right to treatment."

 12. The segregation by untrained correctional officers of some inmates from the general population on the basis of suspected homosexuality constitutes a violation of their state and federal right to treatment.

 13. Failure to allow and encourage full participation of family and interested friends in the program of a youthful offender constitutes a violation of the juvenile's state and federal right to treatment.

 14. The practice of withholding or neglecting to provide casework, nursing, and psychological or psychiatric services to juveniles confined in solitary confinement or security facilities constitutes a violation of their state and federal right to treatment.

 15. Failure to provide inmates of a maximum security institution such as Mountain View, which has a history

of brutality, neglect, and intimidation, with access to a person who can hear their complaints and seek administrative redress for their grievances without fear of reprisals, constitutes a violation of their state and federal right to treatment.

 16. Confinement of juveniles in an institution in which a nurse is not available on the premises twenty-four hours a day constitutes a violation of their state and federal right to treatment.

 17. The employment by the TYC of persons whose personalities, backgrounds, or lack of qualifications render them likely to harm the juveniles in their care either physically or psychologically, absent any attempt to administer the appropriate psychological testing or psychiatric interviews, constitutes a violation of the juveniles' state and federal right to treatment. In particular, failure to employ an individual who is qualified by education, experience, and personal attributes to superintend the rehabilitation of juveniles who have engaged in seriously delinquent behavior constitutes a violation of those juveniles' state and federal right to treatment.

18. The plaintiffs are without an adequate remedy at law that would protect them against the wrongs described in the foregoing findings of fact.

 19. It is appropriate at this time for the court to enter a preliminary injunction to enjoin certain of the practices complained of by the plaintiffs, because their continuation would work irreparable injury, both physical and psychological, upon members of the plaintiff class.[1] *See, e. g.* Nelson v. Heyne, *supra*; Inmates v. Affleck, *supra.*

### EMERGENCY INTERIM RELIEF

In accordance with the findings of fact and conclusions of law set out

---

1. In other matters arising from this civil action, this court has issued a preliminary injunction regarding the rights of inmates to confer privately with their attorneys and to correspond with them without interference, *see* 326 F.Supp. 670; and has issued a discovery order permitting four experts trained in sociology and psychology to live in the institution for four weeks under conditions experienced by the inmates and to report to the court at the conclusion of the study, *see* 59 F.R.D. 157.

above, which are preliminary only and made solely for the purpose of responding to the plaintiffs' motion for emergency interim relief (joined in by the United States and the other *amici* group) it is

Ordered that the defendants, their officers, agents, servants, and employees, and those persons in active concert or participation with them who receive actual notice of this order by personal service or as otherwise hereinafter provided, are hereby enjoined, pending final order of this court, from operating the facilities of the TYC in any way inconsistent with the following provisions of this order:

### USE OF PHYSICAL FORCE

1. Except to the extent that the use of corporal punishment is governed by Tex.Rev.Stat.Ann. art. 5130,[2] the use of physical force of any kind by any TYC personnel on any TYC inmates shall not be permitted except to the extent reasonably necessary (i) in self-defense, (ii) in defense of third persons, whether TYC inmates or TYC personnel or others, (iii) in effecting restraint on TYC inmates in the act of escaping, or (iv) to prevent substantial destruction of property.

> (a) In defending persons or property, the threat to persons must be imminent, and the threat to property must be both imminent and substantial.
>
> (b) The use of physical force must never exceed that reasonably necessary to effect the purposes permitted in (1) above. In effecting restraint on TYC inmates in the act of escaping, the force reasonably necessary does not include striking or beating.

2. The use of Mace is prohibited.

3. The use of tear gas or any other crowd-control chemical substance is prohibited except to the extent reasonably necessary to bring under control a riot that threatens imminent harm to human life or imminent and substantial destruction of property.

4. Any TYC inmate who considers that he has been the victim of any use of force by a TYC employee that is prohibited by this order may file with his caseworker (or in the absence of his caseworker, some other caseworker) a report setting out the allegations. This report shall be forwarded forthwith to the superintendent of the institution concerned. Within ten days of the date of the alleged incident, the superintendent shall investigate the alleged incident and file a written report detailing his findings and conclusions with all counsel in this civil action and with this court.

### SEGREGATION

1. Effective immediately, no TYC inmates shall be segregated or assigned to dormitories or other facilities on the basis of race, color, or national origin.

2. No TYC inmates not now residing in a dormitory designed to segregate inmates suspected of homosexuality from the rest of the TYC inmate population shall be assigned to such a dormitory; *provided, however,* that the removal of

---

2. Although the portion of this statute permitting the use of a leather strap to administer up to ten lashes under certain conditions was not the subject of any testimony or request for relief, Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968), casts considerable doubt upon its constitutionality. Writing for a unanimous Eighth Circuit panel prior to his elevation to the United States Supreme Court, Judge Blackmun concluded

> that the use of the strap in the penitentiaries of Arkansas is punishment which, in this last third of the 20th century, runs afoul of the Eighth Amendment; that the strap's use, *irrespective of any precautionary conditions which may be imposed,* offends contemporary concepts of decency and human dignity and precepts of civilization which we profess to possess; and that it also violates those standards of good conscience and fundamental fairness enunciated by this court in the *Carey* [Carey v. Settle, 351 F.2d 483 (8th Cir. 1965)] and *Lee* [Lee v. Tahash, 352 F.2d 970 (8th Cir. 1965)] cases.

Id. at 579 [emphasis added.]

inmates who now reside in such a dormitory back to the general population shall not be required, nor shall it be prohibited.

## SOLITARY CONFINEMENT, SECURITY, AND DORMITORY CONFINEMENT

### A. DEFINITIONS

"Solitary, confinement" is defined as the placing of a TYC inmate alone in a other than a room in the inmate's own locked or otherwise secured room or cell dormitory.

"Security" is defined as the placing of a TYC inmate in a locked or otherwise secured building, which may contain one or more solitary confinement rooms or cells. The definition includes, but is not limited to, a Security Treatment Cottage or infirmary.

"Dormitory confinement" is defined as the placing of a TYC inmate alone in a locked or otherwise secured room in his own dormitory.

### B. DECISION TO PLACE IN SOLITARY CONFINEMENT OR SECURITY

1. No TYC inmate shall be placed in solitary confinement, security, or dormitory confinement, or otherwise confined in a room or building, except in conformance with this order; *provided, however,* that nothing herein shall be construed to prohibit locking the outer doors of dormitory buildings during normal sleeping hours. This provision does prohibit, however, the confinement of juveniles in individual dormitory rooms or cells by chaining or night-latching their doors, except in conformance to section E herein.

2. No TYC inmate shall be placed in solitary confinement or security by any TYC personnel for longer than one hour in the absence of a written statement, signed by the inmate's caseworker (or, in his absence, by some other caseworker), declaring that the caseworker has talked to or visited with the inmate and has concluded that such confinement meets the standards set out hereafter in (C)(1) or (D)(1), whichever is applicable.

### C. SOLITARY CONFINEMENT

1. No TYC inmate shall be placed in solitary confinement unless such confinement is clearly necessary to prevent imminent physical harm to the inmate or to other persons or clearly necessary to prevent imminent and substantial destruction of property.

2. While confined in solitary confinement, the inmate shall be visited by his caseworker (or, in his absence, by some other caseworker) for a period of ten minutes each hour until his release from solitary confinement, excepting only the hours between 10:00 p. m. and 7:00 a. m. The inmate shall be visted by a registered nurse at least once a day; if he is confined for longer than one day, a psychiatrist or a psychologist shall consult with the inmate and afford him such treatment as is indicated on a daily basis beginning no later than the second day of such confinement.

In no event shall an inmate be placed in solitary confinement for longer than three consecutive days in the absence of a written report prepared and signed by the inmate's caseworker, detailing the justification for such confinement. Copies of this report shall be forwarded forthwith to the Executive Director of TYC, all counsel in this civil action, and to this court. If such confinement exceeds five consecutive days, the burden of preparing and filing these written reports shall shift to the Executive Director of TYC.

3. No TYC inmate shall be placed in solitary confinement unless a person within calling distance of the inmate is at all times in possession of a key to the isolation room or cell.

### D. SECURITY

1. No TYC inmate shall be confined in security unless such confinement is clearly necessary to prevent escape or clearly necessary to restrain behavior

that creates substantial disruption of the routine of the institution.

2. While confined to security, the inmate shall be visited at least once a day by his caseworker (or, in his absence, some other caseworker) and by a registered nurse. If he is confined for longer than one day, a psychiatrist or a psychologist shall consult with the inmate and afford him such treatment as is indicated no later than the second day of such confinement.

In no event shall an inmate be confined to security for longer than three consecutive days in the absence of a written report prepared and signed by the inmate's caseworker, detailing the reasons for such confinement. Copies of these reports shall be forwarded forthwith to the Executive Director of the TYC, all counsel in this civil action, and to this court. If such confinement exceeds ten consecutive days, the burden of preparing and filing these reports shall shift to the Executive Director of· TYC.

### E. DORMITORY CONFINEMENT

1. As an alternative to placement in solitary confinement or security, a TYC inmate may be placed in dormitory confinement.

2. No TYC inmate shall be placed in dormitory confinement unless such confinement meets the standards prescribed for solitary confinement in C(1) or for security in D(1). In no event shall dormitory confinement exceed fifty minutes.

### F. CONDITIONS OF SOLITARY CONFINEMENT, SECURITY, AND DORMITORY CONFINEMENT.

The following provisions shall apply to all TYC inmates (whether placed in solitary confinement, security, dormitory confinement, or otherwise):

1. A bed, mattress, appropriate bedding, and access to a toilet (not a chamber pot) shall be provided for all TYC inmates in the place where they sleep.

2. The so-called "silence rule," requiring that confined inmates sometimes maintain silence during periods of the day other than those that reasonably require some order (such as academic or vocational classes) shall not be enforced.

3. All TYC inmates shall enjoy the opportunity for at least one hour of large-muscle exercise or recreation on a daily basis, unless dispensed with by a physician (in the case of bodily infirmities) or a psychiatrist (in the case of mental conditions) in writing.

4. School books and daily lesson plans that reflect an amount of daily instruction consistent with the educational practices of the school program in the institution as a whole shall be provided all TYC inmates, unless a psychiatrist otherwise directs in writing.

5. Repetitive, nonfunctional, degrading, and unnecessary tasks (so-called "make work", such as buffing a waxed floor that has already been sufficiently buffed or pulling grass in an open field not intended for cultivation or any other purpose) are prohibited.

6. No TYC inmate shall be disciplined for sleeping during periods of the day other than those that reasonably require some attention by the inmate (such as academic or vocational classes or work other than the so-called "make work," referred to in (5) above.) In no event, however, shall any discipline be administered that is inconsistent with other parts of this order.

### MAXIMUM SECURITY CONFINEMENT: MOUNTAIN VIEW

1. No juvenile committed to the custody of the Texas Youth Council and not now assigned to Mountain View State School for Boys (hereinafter referred to as Mountain View) shall be assigned or transferred to Mountain View after the date of this order except upon a written finding by the classification committee that the juvenile has in the past, either prior to or subsequent to commitment, committed acts that, if committed by an adult, would constitute the offense of murder, voluntary manslaughter, kidnapping, aggravated kidnapping, rape, ag-

gravated rape, sexual abuse, aggravated sexual abuse, sexual abuse of a child, aggravated assault, deadly assault on a peace officer, arson, robbery, or aggravated robbery, as defined in the Texas Penal Code (approved June 14, 1973; effective January 1, 1974), Tex.Laws 1973, ch. 399. Definitions of all terms relevant to these crimes shall be governed by the new Texas Penal Code.

2. Any juvenile that the classification committee considers a candidate for assignment or transfer to Mountain View shall be present at the committee meeting during all deliberations about his assignment. He shall be given an opportunity to make any statements and ask any questions that he desires. If the committee decides to assign or transfer the juvenile to Mountain View, it must prepare written reasons justifying the assignment or transfer and furnish forthwith a copy thereof to all counsel in this civil action and to this court.

3. Mountain View shall be administered in accordance with all other applicable provisions of the court's order, including but not limited to those provisions concerning use of physical force and tear gas and the employment of solitary confinement, security, and dormitory confinement.

### OMBUDSMAN

1. Mr. Charles L. Derrick shall serve during the pendency of this interim order as Ombudsman for the juvenile inmates of the Mountain View State School for Boys. He shall have the duty of reporting to this court any matters concerning the operation of the Mountain View facility that should be brought to the court's attention, especially any violations of this court's order. He may, if he wishes, forward a copy of his reports to any other interested party, but he shall not be required to do so.

2. All inmates and staff members of Mountain View shall have free access to Mr. Derrick, and no person shall interfere with Mr. Derrick's performance of his duties as Ombudsman or with any person who wishes to consult with him in that capacity.

3. Mr. Derrick shall receive notice of and be permitted to attend any meeting of TYC staff, formal or informal, at which policies or procedures affecting Mountain View are discussed. Notice to Mr. Derrick of such a meeting shall be in writing and shall be delivered to him at least twenty-four hours before the meeting, except in the case of an emergency meeting, of which notice shall be given him at the earliest possible time.

4. Mr. Derrick's present salary shall continue to be paid by TYC, and may not be reduced during his occupation of the position of Ombudsman. TYC may, if it so desires, continue to employ Mr. Derrick in his present position as Chief of Casework Services at Mountain View, provided that the performance of his duties as Chief of Casework Services shall not interefere with his duties as Ombudsman.

5. Mr. Derrick shall be provided with office space, secretarial assistance, office supplies, and all other facilities necessary to the performance of his duties as Ombudsman.

6. Mr. Derrick shall have free access to all records kept in the course of the regular business of Mountain View, and all records of TYC kept in the regular course of its business that relate to matters affecting Mountain View.

7. Mr. Derrick shall make to TYC such recommendations as are appropriate concerning the operation of Mountain View or any matters affecting the operation of Mountain View, especially recommendations concerning compliance with this court's order. A copy of all such recommendations shall be provided to the Executive Director of TYC, the Superintendent of Mountain View, the court, and all counsel in this civil action.

### COMMUNICATION: MAIL; NON-ENGLISH LANGUAGES

#### A. MAIL

1. Outgoing or incoming mail shall not be opened, read, censored, or tampered with in any other manner; *pro-*

*vided, however,* that TYC personnel, in order to search for and seize contraband, may open but not read incoming mail in the presence of the TYC inmate to whom the particular piece of mail is addressed. Contraband shall consist of any object or substance the knowing possession of which constitutes a crime under the laws of the State of Texas or the United States or any other object or substance that would clearly pose a danger to human life or property within the TYC facilities.

2. The number of persons with whom TYC inmates may correspond by mail shall not be limited. Writing paper, envelopes, pencils or pens, and at least three 8-cent stamps per week shall be provided at reasonable times and places each day.

### B. NONENGLISH LANGUAGES

The speaking or writing of non-English languages shall not be prohibited or discouraged under circumstances that would not give rise to similar prohibitions regarding the English language.

### VISITATION RIGHTS

Visitation by family and friends of TYC inmates shall be permitted (1) for at least two hours a day on at least two separate days between Monday and Friday, inclusive, except holidays; (2) on Saturdays, Sundays, and holidays between 9:00 a. m. and 5:00 p. m.

### NURSING CARE

At least one registered nurse shall be available on the premises of each of the six TYC institutions on a 24-hour basis.

### SCREENING OF PROSPECTIVE TYC PERSONNEL

1. All TYC personnel hired, rehired, or promoted after the date of this order to any position shall meet the qualifications for that position set forth in the Texas Position Classification Plan, as established for the TYC by the Texas State Auditor (United States Exhibit No. 20).

2. All TYC personnel who apply after the date of this order for a position bringing them into contact with juveniles on a regular basis shall be required to submit to psychological testing and psychiatric interviews. TYC shall not hire any employee the results of whose testing casts doubt upon his psychological fitness to work with children.

3. Upon the rehiring of any former TYC personnel during the period of this interim relief, defendants in this civil action shall give notice forthwith of such rehiring to all counsel and to this court.

It is further Ordered that copies of this order shall be sent by certified mail, return receipt requested, to the three appointed members of the TYC, to the Executive Director of the TYC, and the Superintendents of the Mountain View, Gatesville, Giddings, Gainesville, Crockett and Brownwood institutions under the jurisdiction of the TYC. It is further

Ordered that the Executive Director of the TYC instruct each of the Superintendents of the above-named schools to hold meetings of all employees, full time, part time, or consulting, of their respective schools, in order that the Superintendent may read and discuss this order with them. At the conclusion of these meetings, every employee shall sign a form indicating that he or she understands every provision in the order. Forms containing these signatures shall be forwarded forthwith to the Executive Director of TYC. These meetings may be conducted in shifts; *provided, however,* that these meetings with all employees shall be completed and forms containing employee signatures shall be completed and placed in the mail to the Director of TYC no later than seven days from the date of his receipt of this court's order. It is further

Ordered that three (3) copies of this order be posted within four days of the receipt of this court's order by the Executive Director of TYC in every fa-

cility located within the six above-named institutions in which TYC inmates sleep, including dormitories, the infirmary, or any of the facilities described in this order as constituting security. The order shall be posted in a conspicuous place, preferably a bulletin board near the entrance of the building.